Brian S. King, #4610
Brent Newton, #6950
Nediha Hadzikadunic, #15851
BRIAN S. KING, P.C.
420 East South Temple Suite 420
Salt Lake City, UT 84111
Telephone: (801) 532-1739
Facsimile: (801) 532-1936
brian@briansking.com
brent@briansking.com
nediha@briansking.com

Attorneys for Plaintiff

THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| JENNIFER LOWE,<br><br>        Plaintiff,<br><br>vs.<br><br>UNITED of OMAHA LIFE INSURANCE COMPANY. | MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT<br><br>Civil No. 2:18-cv-00848 EJF<br><br>Honorable Evelyn J. Furse |

Plaintiff Jennifer Lowe, ("Jennifer"), through her undersigned counsel and pursuant to F.R.Civ.P. 56, and DUCiv 56-1, submits her Motion for Summary Judgment and Memorandum in Support and against Defendant United of Omaha Life Insurance Company ("United"). Plaintiffs anticipate that United have or will have provided the Prelitigation appeal record (Record") for this ERISA-governed case to the Court. The Record consists of documents that have been Bates stamped UNITED0001 - UNITED2209. Citations to the record will be designated using the first page as an example as Rec. 1.

# OVERVIEW

Jennifer is 37 years old and worked as a Director of Sales and Events for the Utah Olympic Park Foundation. On November 8, 2015 Jennifer was rear ended in a motor vehicle accident and evaluated by medical personnel to address symptoms of concussion and whiplash. Jennifer continued to work but experienced numerous symptoms that interfered with her employment even though she was receiving physical therapy and medical care. In late February, 2016, Jennifer took some time off from work to visit family and her symptoms reduced. On March 1, 2016 she returned to work with a modified duties.

Her employer made several adjustments to reduce her schedule and limit some of her activities to address her headaches and difficulties with focusing and discomfort while using the computer. Jennifer's employer even took her laptop away when Jennifer left for the day to make sure she wouldn't work while she was at home. Even with these adjustments, Jennifer's symptoms worsened. She began to feel dizzy and suffered anxiety when she was in social settings like the mall. Jennifer noted that these symptoms were aggravated when she performed the regular duties of her job.

Before the accident, Jennifer was very active in sports and outdoor activities. In May of 2017, Jennifer was cleared for simple golf strokes like putting and easy road cycling and it appeared she was on the road to recovery. Even after her employer provided Jennifer a modified schedule, Jennifer's symptoms persisted and she continued to experience high levels of stress and headaches that interfered with her ability to do her job. Traveling between Olympic venues in Salt Lake County and Park City revealed issues with her vision in certain lighting situations and caused headaches, fatigue and other problems.

In November of 2016, Jennifer had an MRI that revealed abnormalities in her brain in relation to memory, attention, and verbal fluency. The MRI helped confirm why Jennifer had the problems that prevented her from doing the material duties of her regular employment. On December 15, 2016, Jennifer's treatment provider recommended a leave of absence and December 22, 2016 was Jennifer's first day of absence from her employment. At that time, Jennifer was no longer able to perform the material duties of her occupation due to post concussive syndrome, complicated by whiplash mechanism of injury, retinal tear in her right eye, along with chronic neck pain, frequent headaches, visual function reduction with increased sensitivity, poor visual endurance, cognitive impairment with auditory processing, poor attentional control, as well as an inability to multitask with lack of cognitive efficiency. These conditions have required ongoing medical treatment. Jennifer's worsening symptoms led to her inability to continue working.

Jennifer applied for short term disability, and on February 13, 2016, United initially denied her claim. United stated that the reasons for the denial were that Jennifer had continued to work, gone on vacation, had skied, and hiked with her dog. On May 9, 2016, United granted Jennifer's appeal and reversed its original decision to deny short term disability benefits, United did not provide a rationale for why it changed its mind.

On November 6, 2017, United sent Jennifer a letter stating that it had reviewed her claim for long term disability and it had denied the claim. On May 4, 2018, Jennifer appealed to United its decision to deny her long term disability benefits because she was unable to perform the main duties of her occupation and her treating providers documented Jennifer's symptoms and conditions that interfered with her job performance. United's reviewers did not agree that Jennifer's injuries and symptoms could have been caused by her car accident and United sent a

report so that Jennifer could respond to the recommendation to deny benefits. One of Jennifer's providers, Dr. Andrew Nichols, wrote rebuttal letters that explained how United had asked the wrong question and misinterpreted the data when it concluded that Jennifer was not entitled to benefits. Nevertheless, United relied on the erroneous decision and upheld the denial of benefits.

In order to address United's wrongful denial of long-term disability benefits, Jennifer brought this action. Multiple functional capacity assessments in the pre-litigation record indicated that Jennifer would have a medical need to be absent from a full-time work schedule. Specifically, one provider opined that Jennifer would miss between 5-10 days each month. The reviewers for United failed to address these conclusions or explain how Jennifer could continue to do the main duties of her employment when she would be expected to be absent on a regular and consistent basis as a result of her chronic conditions.

Jennifer asks that United's decision to deny long term disability benefits be reversed. Specifically, she asks this Court to order United to pay for her past due benefits under the long-term disability plan along with prejudgment interest and an award of attorney fees. Because the policy terms differ for long-term benefits after two years, Jennifer asks this Court to remand to United the issue of what benefits to which she will be entitled under an "any occupation standard" for the period after her first two years of disability under the "own occupation" standard.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

### Preliminary and Jurisdictional Facts

1. The Plaintiff, Jennifer Lowe, resides in Salt Lake County, State of Utah and is 37 years old, born on January 27, 1982. (Rec. 62)

2. United is an affiliate or subsidiary of Mutual of Omaha, a Fortune 500 corporation

providing insurance, banking, and financial services throughout the United States, and headquartered in Omaha, Nebraska. United denied payments related to Jennifer's long-term disability. (Complaint, 2; Answer, 2)

3. Jennifer worked for the Utah Olympic Legacy Foundation that provided benefits under a long-term disability plan ("the Plan") that was administered by United. Jennifer was a participant in the Plan. (Complaint, 3, Answer, 3, Rec. 361)

4. The Plan is an employee benefit plan governed by the Employment Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §1001, et. seq. (Complaint ¶4; Answer ¶4)

5. The Plan provides coverage for participants who become unable to perform the specialized duties of their own occupation. (Complaint ¶5, Answer ¶5, Rec. 377, 386)

6. This Court has jurisdiction to consider this ERISA-governed case. (Complaint ¶6, Answer ¶6,)

## Terms of the Plan

7. The terms of the Plan define the following:

*Disability* and *Disabled* mean that because of an Injury or Sickness, a significant change in Your mental or physical functional capacity has occurred in which:
a) during the Elimination Period, You are prevented from performing at least one of the Material Duties of Your Regular Occupation on a part-time or full-time basis; and
b) after the Elimination Period, You are:
   1. prevented from performing at least one of the Material Duties of Your Regular Occupation on a part-time or full-time basis; and
   2. unable to generate Current Earnings which exceed 99% of Your Basic Monthly Earnings due to that same Injury or Sickness.

After a Monthly Benefit has been paid for 2 years, *Disability* and *Disabled* mean You are unable to perform all of the Material Duties of any Gainful Occupation.

Disability is determined relative to Your ability or inability to work. It is not determined by the availability of a suitable position with the Policyholder. (Rec. 386)

*Material Duties* means the essential tasks, functions, and operations relating to an occupation that cannot be reasonably omitted or modified. In no event will We consider working an average of more than the required Full-Time hours per week in itself to be a

part of material duties. One of the material duties in Your Regular Occupation is the ability to work for an employer on a full-time basis. (Rec. 387)

*Regular Occupation* means the occupation You are routinely performing when Your Disability begins. Your regular occupation is not limited to Your specific position held with the Policyholder, but will instead be considered to be a similar position or activity based on job descriptions included in the most current edition of the U.S. Department of Labor Dictionary of Occupational Titles (DOT). We have the right to substitute or replace the DOT with another service or other information that We determine to be of comparable purpose, with or without notice. To determine Your regular occupation, We will look at Your occupation as it is normally performed in the national economy, instead of how work tasks are performed for a specific employer, at a specific location, or in a specific area or region. (Rec. 388)

*Medically Necessary* means care that is ordered, prescribed, or rendered by a Physician or Hospital, and is determined by Us, or a qualified party or entity selected by Us, to be:
 a)  provided for the diagnosis or direct treatment of Your Injury or Sickness;
 b)  appropriate and consistent with the symptoms and findings or diagnosis and treatment of Your Injury or Sickness; and
 c)  provided in accordance with generally accepted national professional standards and/or medical practice.

*Physician* means any of the following licensed practitioners:
 a)  a doctor of medicine (MD), osteopathy (DO), podiatry (DPM) or chiropractic (DC);
 b)  a licensed doctoral clinical psychologist;
 c)  a Master's level counselor and licensed or certified social worker who is acting under the supervision of a doctor of medicine or a licensed doctoral clinical psychologist;
 d)  a licensed physician's assistant (PA) or nurse practitioner (NP); or
 e)  where required by law, any other licensed practitioner of a healing art who is acting within the scope of his/her license.

A physician does not include:
a) a naturopathic doctor;
b) an acupuncturist;
c) a physician in training; or
d) You, Your Spouse, any person who lives with You, a child, brother, sister or parent of You or Your Spouse. (Rec. 388)

8. The Plan provided authority for United to interpret the terms of the Plan during the

internal claim review and appeals process. Rec. 382

9. The Plan stated that a participant can file suit and "a court will review Your or Your beneficiary's eligibility or entitlement to benefits under the Policy" when a claim for benefits has been denied. Rec. 382

**Factual Background**

10. On November 8, 2015, Jennifer was in an automobile accident and was struck from behind by another driver. After the accident, Jennifer complained of constant chronic neck pain, cognitive dysfunction, hearing loss, severe fatigue, dizziness, anxiety, headaches, irritability, becoming easily overwhelmed, and newfound disturbances in her vision, such as sensitivity to light due to a torn retina. (Rec. 54-56, 67-68, 294, 483)

11. These conditions have required ongoing medical treatment. (293-296)

12. At the time of the accident, Jennifer was director of Group Sales and Events with the Utah Olympic Legacy Foundation. Jennifer was responsible for the generation and coordination of special events at the Utah Olympic Park and Oval. (Rec. 54, 62)

13. Jennifer had previously earned a college degree as well as a master's degree in sports management. (Rec. 1337)

14. Jennifer had spent her entire career in sales and marketing. (Rec. 1337)

15. After the accident, Jennifer continued working but she started to experience negative symptoms and was evaluated by medical staff at her place of employment. (Rec. 293)

16. On November 13, 2015, Jennifer was evaluated for a concussion by her physical therapist, Lauren Ziaks at Wasatch Physical Therapy & sports medicine. Jennifer was diagnosed with cervicalgia (neck pain), muscle spasm, acute post-traumatic headache, dizziness, unsteadiness on foot, sprain of ligaments of cervical spine and concussion without loss of consciousness. (Rec. 67, 294)

17. Ms. Ziaks continued to treat Jennifer for headaches and interrupted sleep issues. (Rec. 70, 71)

18. Although Jennifer continued to have difficulties and became fatigued from work on the computer, she was cleared to ski on groomed runs. Jennifer reported that she became fatigued very quickly when skiing. (Rec. 77)

19. Because of increasing symptoms with driving and flat light, Ms. Ziaks referred Jennifer to an ophthalmologist who found a horseshoe retinal tear. (Rec. 80)

20. On December 29, 2015, Jennifer reported that she was sleeping much more than usual and that flat light was causing significant eye pain and that she was suffering constant headaches. (Rec. 79)

21. Ms. Ziaks noted that Jennifer had reduced symptoms in sunlight, but flat light caused increased symptoms. She recommended that Jennifer turn off lights and work to see better and reduce headaches. (Rec. 83)

22. On February 23, 2016 Jennifer reported a reduction in symptoms after she took some time off from work. (Rec. 93)

23. On March 1, 2016, Ms. Ziaks performed a follow up concussion evaluation. While some symptoms had improved, Jennifer required ongoing treatment to reduce pain, strain, and fatigue, and needed to show improvement in deficits that prevented her from completing activities of daily living. Jennifer also had limits in functional activities including reading, driving, and community activities. She reported feeling overwhelmed, dizzy, and anxious in public settings like a mall. (Rec. 93- 96)

24. In March of 2016, Jennifer began working a modified schedule at work. (Rec. 55)

25. On March 21, 2016, Jennfier identified stress at work as a contributing factor to her

symptoms because a six-day trip out of town resulted in most of her symptoms going away. (Rec. 103)

26. By May 17, 2016, Jennifer reported being excited about her improvements and being cleared to chip and putt as well as ride a road bike. (Rec. 112)

27. On June 28, Ms. Ziaks requested additional advice from Dr. Price and Ms. Roalstad on Jennifer's "complicated case." (Rec. 129)

28. On July 5, 2016, Jennifer reported significant difficulties doing a memory game, Lumosity, a game that she used to do in the past but is much harder after her accident. (Rec. 132)

29. On July 15, 2016, Jennifer reported that she was still dealing with headaches and nausea and battling severe fatigue. She reported that attendance at a concert forced her to lie down due to a severe headache and eye pain from flashing lights and the noise. She also expressed nervousness when in crowds. (Rec. 134)

30. Jennifer got a dog to help with stress management. (Rec. 135)

31. On August 4, 2016, Jennifer continued to have significant difficulty with fatigue caused by eye problems working at the computer, even though she wasn't working her regular work schedule. (Rec. 137)

32. On November 30, 2016, Jennifer underwent a functional MRI by Dr. Wendell Gibby, that found abnormal activation in relation to memory, attention and verbal fluency. The testing revealed significant deviation and hyperactivation in short term and verbal memory. (Rec. 55, 235-239)

33. Jennifer's worsening symptoms led to her inability to continue working, and on November 15, 2016, Melinda Roalstad PA-C recommended that Jennifer begin a leave of

absence to focus on her recovery. (Rec. 55-56, 793-795)

34. Ms. Roalstad PA-C, documented post-concussion syndrome, emotional stress, chronic post-concussive headache cervicalgia, cognitive impairment, disorder of vision, and mild cognitive impairment. (Rec. 793-795)

35. Ms. Roalstad recommended that Jennifer follow-up with Dr. Andrew Nichols for a neuropsychological exam. (Rec. 795-96)

36. Ms. Roalstad completed a Restrictions and Limitation form and indicated that Jennifer was unable to spend "extended time with visually focused tasks, cognitive multi-tasking." (Rec. 347-349 )

37. Ms. Roalstad also indicated that Jennifer was not able to work as of December 22, 2016 even with Job modifications. (Rec. 349)

38. After the accident, Jennifer found it difficult to effectively carry out the duties of her occupation. She had difficulty concentrating, multitasking, staying organized and became prone to misplacing things. She was more easily distracted, impulsive, and would often forget her destination while driving. Jennifer became easily agitated and described herself as being "mean to everyone." These behaviors were very atypical for Jennifer before the accident. (Rec. 576-592, 2177-2178)

39. Jennifer stopped working on December 22, 2016 when she was no longer able to perform the material duties of her occupation due to post concussive syndrome, along with chronic neck pain, frequent headaches, visual function reduction with increased sensitivity, poor visual endurance, cognitive impairment with auditory processing, poor attentional control, as well as an inability to multitask with lack of cognitive efficiency. (Rec. 54-55, 129, 241, 2177-78)

**Short Term Disability Claim**

40. Jennifer applied for short term disability but United initially denied that claim in a letter dated February 13, 2016. (Rec. 190)

41. United gave as reasons for denying the disability the following:

    a.  Jennifer had continued to work after her accident until December 21, 2016.

    b.  She had gone on vacation, skied, and hiked with her dog.

    c.  There were no identifiable cognitive or functional restrictions and limitations that precluded [Jennifer] from doing her job. (Rec. 192)

42. Following the original denial of benefits, Jennifer completed a neuropsychological evaluation with Dr. Nichols. (Rec. 241)

43. Dr. Nichols found the following:

    a.  In a motor vehicle accident, Jennifer suffered a whiplash type injury that caused symptoms consistent with post concussive syndrome, or traumatic brain injury.

    b.  Jennifer suffered reductions in working executive function, memory and attention and developed visual reduction and light sensitivity.

    c.  Jennifer often experienced headache and fatigue.

    d.  The evaluation results were valid.

    e.  Jennifer and collateral sources noted "marked decline in her social inhibition, executive efficiency, and general sense of motivation."

    f.  Reductions in sustained visual attention would exacerbate sensations of fatigue and cognitive disorganization, especially when dealing with complex visual information like tables and charts in PowerPoint.

    g.  Jennifer received a diagnosis of Mild Neurocognitive Disorder.

44. Jennifer continued to see other treating providers and a chiropractor, as well as participate with a neuroplasticity clinic in Florida. (Rec. 241, 54-55)

45. On March 30, 2017, Jennifer's chiropractor, Dr. Jason Smith, wrote that Jennifer's "impairment in her Cervical region is due to ratable Loss of Motion Segment Integrity and has permanent injuries." (Rec. 141)

46. On April 17, 2017, United acknowledged that it had received Jennifer's appeal regarding her Short Term Disability Claim. (Rec. 188)

47. In a letter dated May 9, 2017, United informed Jennifer that it had overturned its original decision to deny benefits. The letter did not provide a clinical reason for the reversal. (Rec. 51)

**Long Term Disability Claim**

48. Jennifer submitted a claim for Long Term Disability. (Rec. 1217)

49. Jennifer complied with United's request to have an independent medical evaluation, with Kevin Duff, Ph.D. (Rec. 1337-1348)

50. Dr. Duff's evaluation resulted in invalid results regarding Jennifer's cognitive measure and that the test results were not a reliable indicator of Jennifer's then current functioning. (Rec. 1343)

51. Dr. Duff's evaluation did not include collateral interviews. (Rec. 1342)

52. Dr. Duff admitted that because the test results were not valid, he did not have reliable evidence regarding Jennifer's functional abilities and limitations. (Rec. 1347)

53. Dr. Duff found that Jennifer is consistent in reporting her cognitive, somatic, and psychiatric symptoms in the medical records and his evaluation. (Rec. 1346)

54. United conducted surveillance on Jennifer, which scared her as the person following her ran red lights. Jennifer made a report to the police. (Rec. 1314, 1329-1335)

55. In a letter dated November 6, 2017, United denied Jennifer's claim for long-term disability benefits. (Rec. 506)

56. United listed the following as reasons for its denial:

    a. Based on the information in the file, your last day of work as a Director of Group Sales and Events was December 21, 2016 and you claimed disability beginning December 22, 2016 for post concussive syndrome, post-traumatic headache, visual disorder, mental disorder, and acute stress disorder. Your policy has a 90 day elimination period and the benefit commencement date was March 23, 2017. Your Short-Term Disability claim was approved by the Appeals department and benefits were paid from January 5, 2017 to March 22, 2017

    b. Our consultant concluded that the available evidence does not reflect any neurologic impairment. He further opined that based on the evaluation completed by Dr. Duff on August 21, 2017, there was indication that your cognitive functioning was greater than your self-reporting would indicate.

    c. The consultant opined that based on the review of the available medical documentation there are no supported work restrictions or limitations. He noted that the records on file are inconsistent with a significant injury to the head that would lead to your multiple reported symptoms.

    d. In conclusion, there is a lack of sufficient evidence to support any neurological or cognitive impairment that would preclude you from performing the Material Duties of your Regular Occupation. Therefore, as previously stated, no benefits are payable and your claim has been denied.

**Appeal of Long Term Disability**

57. Jennifer appealed the decision to deny benefits on May 4, 2018.

58. Jennifer included medical and treatment records from multiple providers including the following:

    a. Dr. Nichols
    b. Ms. Roalstad
    c. Dr. Smith
    d. Justyn Manley, Licensed Clinical Social Worker
    e. Dr. Wendell Gibby

(Rec. 460-461)

59. Jennifer provided United with Dr. Nichols' neuropsychological. (Rec. 555)

60. Jennifer provided United with a letter from Ms. Roalstad that summarized her involvement with Jennifer for the previous two years plus. (Rec. 533)

61. Jennifer provided Ms. Roalstad's updated assessments of limitation for purposes of determining disability (Rec. 537-544)

62. The assessments concluded that Jennifer would miss between 5-10 days per month. (Rec. 539)

63. Dr. Smith provided objective findings that Jennifer was unable to resume employment. (Rec. 546-548)

64. Jennifer submitted numerous letters from friends and family who confirmed the changes that had occurred in her life to corroborate her inability to work. She had changed in personality, activity level, attitude, and memory. (Rec. 576-592)

65. United had Dr. Lauren Drag and Dr. Wayne Gordon review the medical record. (Rec. 458-464, 469-481)

66. Dr. Drag and Dr. Gordon failed to address or evaluate the letters from Ms. Roalstad and Dr. Smith. (Rec. 458-464, 469-481)

67. Neither Dr. Drag, nor Dr. Gordon opined that the medical record supported restrictions and limitations for Jennifer. (Rec. 458-464, 469-481)

68. Dr. Nichols provided a rebuttal to the recommendations from Dr. Drag and Dr. Gordon.
    a. Dr. Nichols confirmed that the medical records provided to Drs. Drag and Gordon provided evidence of significant abnormal activation with Jennifer's short term verbal memory and that the activation occurs when the brain is compensating for dysfunction. (Rec. 445)
    b. Dr. Nichols found that Dr. Drag minimized the severity of Dr. Gibby's findings. (Rec. 446)
    c. Dr. Nichols cited to scientific literature that documents unresolved reductions

secondary to mild traumatic brain injury. (Rec. 446)

    d. Dr. Nichols challenged Dr. Drag's suggestion that his psychological had questionable validity and provided an explanation demonstrating the validity of the results from his testing. (Rec. 446)

        i. In her response, Dr. Drag acknowledged that Dr. Nichols testing was valid using the measures he identified. (Rec. 423)

    e. Dr. Nichols provided additional rationale to support his diagnosis of Mild Neurological Disorder, Secondary to Traumatic brain injury. (Rec. 446)

    f. Dr. Nichols also identified dysfunction in Jennifer's executive function relative to Jennifer's overarching intellectual capabilities. (Rec. 447)

    g. Because Jennifer had an "unremarkable medical history, it is more likely than not that her cognitive declines within the domains of complex attention, auditory memory, and executive function are secondary to her 11/08/15 [motor vehicle accident.]" (Rec. 447)

69. Dr. Drag acknowledged that Dr. Nichols' evaluation more likely than not produced valid results but she still disagreed with his conclusions that Jennifer was disabled under the terms of the Plan. (Rec. 423)

70. In a letter dated August 2, 2018, United denied Jennifer's appeal. (Rec. 395-401)

71. United's external consultant claimed that Jennifer's injury did not cause a brain injury because it would be expected for her condition to improve not worsen. (Rec. 397)

72. Even though United's consultants found Dr. Nichols testing data valid, United claimed that it was invalid. (Rec. 398)

73. The denial letter made no mention of Dr. Smith or his objective findings. (Rec. 395-401)

74. The denial letter made no mention of Ms. Roalstad's finding that Jennifer would miss between 5 and 10 days per month. (Rec. 395-401)

75. The denial letter stated that Jennifer had exhausted her administrative rights to appeal. (Rec. 399)

//

//

//

**ARGUMENT**

I.      **A DE NOVO STANDARD OF REVIEW IS PROPER UNDER THE FACTS OF THIS CASE BUT UNDER ANY STANDARD OF REVIEW, UNITED'S DENIAL SHOULD BE REVERSED.**

     A.     **Even Under an Arbitrary and Capricious Standard of Review, This Court should Reverse United's Decision to Deny Disability Benefits.**

Regardless of the standard of review that applies, this Court should reverse United's decision to deny Jennifer long-term disability benefits. The foundational elements for United's decision were based on invalid testing. As a result, the conclusions from invalid data and unsupported opinions based on invalid data are equally invalid and wrong.[1] By basing its decision to deny long term disability benefits on invalid data, United's decision was arbitrary and capricious and should be set aside under an arbitrary and capricious standard of review. Jennifer's inability to perform the main duties of her occupation stemmed from a concussive episode during a car accident that caused cognitive problems that were exacerbated when she worked a full time schedule.[2] She had limitations because of her inability to focus and pay attention to details.[3] She also had limitations because heavy computer use negatively affected Jennifer's ability to effectively complete cognitively intensive tasks that were material duties of her occupation. *Id.*

Because United and other reviewers relied on conclusions that were made by Dr. Duff as part of his neuropsychological evaluation United's decision to deny benefits is unreliable, arbitrary and capricious. In his evaluation Dr. Duff wrote, "the examinee's performance on cognitive measures is of questionable validity. Her responses of psychiatric symptoms appear

---

[1] *Brown v. Bellsouth Telcoms.*, 73 F. Supp. 2d 1308, 1323-24 (M.D. Fla. 1999)
[2] Rec. 347-351,-537-544, 546-548, 555-567
[3] *Id.*

exaggerated. As such, the following test results should not be used as a reliable indicator of her current functioning."[4] Under these circumstances greater weight should have been given to treating providers over an examiner who came up with invalid data from which to draw a reliable conclusion.

Dr. Duff was unable to fully interpret the first question in his assessment regarding Jennifer's daily activities.[5] Dr. Duff could not accurately interpret data for depression and anxiety but he still claimed that Jennifer might have exaggerated her symptoms.[6]  Regarding Jennifer's restrictions and limitation Dr. Duff admitted that the test results were not fully valid and he could not interpret them, so he has no valid and reliable evidence to support Jennifer's functional abilities and limitations.[7] While Dr. Duff criticized Dr. Nichols' evaluation, he made no comment regarding Dr. Smith's objective findings that resulted in restrictions and limitations. Dr. Duff also failed to discuss Ms. Roalstad's formal limitation assessments. When Dr. Duff stated he was unable to verify a restriction or a limitation because of unreliable data, he certainly couldn't rule out that possibility with unreliable and invaldid data. On the other hand, Dr. Nichols conducted neuropsychological evaluation that resulted in reliable and interpretable data.[8] To the extent that United failed to consider all of the relevant medical information in the appeal, its decision to deny benefits is also arbitrary and capricious.[9]

//

//

//

[4] Rec. 1343
[5] Rec. 1345
[6] Rec. 1345
[7] Rec. 1347
[8] Rec. 424, 555
[9] *Foust v. Lincoln Nat'l Life Ins. Co.*, 2019 U.S. Dist. LEXIS 164576, at *25-26 (D. Utah 2019)

**B.    Because The Policy Limited Discretionary Authority to the Prelitigation Claim and Appeal Process, this Court should Review Jennifer's Claim for Disability *De Novo.***

The express language of the policy suggests that the Court will conduct a *de novo* review of Jennifer's eligibility for benefits under the terms of the Plan. The default standard of review for claims seeking a reversal of a denial of benefits from ERISA governed plans is *de novo*.[10] But if a plan grants an administrator discretionary authority to interpret the terms of the policy and to determine eligibility for benefits then the reviewing court will usually defer to the administrator's decision and only reverse the denial if the decision was arbitrary and capricious.[11]

Notwithstanding the language in the Plan that provides discretionary authority to United,[12] the policy appears to limit that authority to the prelitigation process. The policy provides:

> If, after exercising the Policy's review procedures, You or Your beneficiary's claim for benefits is denied or ignored, in whole or in part, You or Your beneficiary may file suit and a court will review Your or Your beneficiary's eligibility or entitlement to benefits under the Policy.

The Plan contains explicit language that the reviewing court "**will review**" a plaintiff's "eligibility for entitlement **under the Policy**."[13] If the Court gives meaning to each term of the Plan it should conclude that this language requires a *de novo* review. If United had drafted its policy so that the sentence had ended with a period after the word suit, Jennifer might not question the ambiguity regarding the type of review that a court would provide. In that instance the Plan would simply be complying with the regulations

---

[10] *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)
[11] *Firestone*
[12] Rec 382
[13] Rec. 382

that require notice to plan participants and beneficiaries that they are entitled to bring legal actions to challenge denial of benefits once they have exhausted administrative remedies.[14]

Additionally, United could have avoided the ambiguity if it had stated that the review to determine eligibility would be performed under the law. That construction would have confirmed the right to bring an action and that a reviewing court would apply general legal principles, including rules regarding the standard of review in conducting its review. However, that is not the language of the Plan documents. The Plan provides language that the "court will review Your or Your beneficiary's eligibility or entitlement to benefits under the Policy." The court should accept the plain terms of the contract and review the denial of benefits *de novo*, giving no deference to the decision by the administrator below.[15]

If the court disagrees that this language plainly provides for a *de novo* review, the Court should at least treat the language in the Plan as ambiguous. Plaintiffs have offered a reasonable interpretation of the language that suggests that the Parties anticipated a *de novo* review of a decision to deny benefits.[16] Such ambiguities are resolved in Jennifer's benefit as she was not the drafter of the language. The doctrine of *contra proferentem* requires that these ambiguities be interpreted favorably to beneficiaries like Jennifer and against insurers and administrators like United.[17]

---

[14] 29 C.F.R.2560.503-1(j)(4)(ii)

[15] *Niles v. Am. Airlines, Inc.*, 269 F. App'x 827, 832 (10th Cir. 2008) (citations omitted)

[16] Coats v. Reliance Standard Life Ins. Co., 2019 U.S. Dist. LEXIS 97675, at *12 (N.D. Okla. 2019)

[17] *Coats,* 2019 U.S. Dist. LEXIS 97675, at *7-8

In *Miller v. Monumental Life*, the Tenth Circuit declared that it had "never construed the ambiguities of an ERISA plan against a beneficiary."[18] "Doing so would undermine the policies underlying ERISA, which Congress enacted 'to promote the interests of employees and their beneficiaries in employee benefit plans and to protect contractually defined benefits.'"[19] *Miller* then explains that ERISA also provides benefits to providers creating a balancing of interests between the two. Quoting an earlier Tenth Circuit case, this Court said "accuracy in drafting is not a lot to ask."[20] In essence it was United who invited Jennifer to request a *de novo* review. Jennifer is accepting that invitation.

At the very least, the status of United as the insurer of the ERISA plan for which it also acts as a fiduciary deciding claims that have a direct and immediate impact on its bottom line creates a financial conflict of interest that should reduce any deference this Court may feel is necessary to provide. In *Metropolitan Life Ins. Co. v. Glenn*,[21] the Supreme Court has ruled that the dual role insurers play as ERISA fiduciaries and insurers with an economic stake in the denial of claims creates an inherent conflict that requires some reduction in deference compared to an undiluted abuse of discretion standard of review.[22] The Tenth Circuit agrees that it is proper to "dial back" deference in light of this conflict of interest and the Supreme Court's ruling in *Glenn*.[23]

Pursuant to a *de novo* review, Jennifer will demonstrate that she is entitled to benefits under the terms of the Plan. But even if this Court applies an abuse of discretion

---

[18]  *Miller v. Monumental Life Ins. Co.*, 502 F.3d 1245, 1254 (10th Cir. 2007) (citation omitted)
[19]  *Id.* (citing *Firestone Tire & Rubber Co.*, 489 U.S. at 113 (internal quotation marks omitted))
[20]  *Id.* (citing *Chiles v. Ceridian Corp.*,  95 F.3d 1505,  at 1518)
[21] *Metropolitan Life Ins. Co. v. Glenn,* 554 U.S. 105 (2008)
[22] *Id.* at 114-115
[23] *Weber v. GE Group Life Ass. Co.,* 541 F.3d 1002, 1010-1011 (10th Cir. 2008)

standard of review, Jennifer can show that United failed to provide a legitimate review of all of the medical records that demonstrated her disability and right to benefits. Under these circumstances, this Court can find that United's denial was arbitrary and capricious, and that Jennifer was entitled to benefits under the terms of the Plan.

## II.      JENNIFER QUALIFIES TO LONG TERM DISABILITY BENEFITS UNDER THE TERMS OF THE PLAN.

Because Jennifer was unable to perform certain material duties of her regular occupation, she satisfied the Plan requirements for disability and United should have paid for her long term disability benefits.[24]  The Plan defined *Material Duties* as "the essential tasks, functions, and operations relating to an occupation that cannot be reasonably omitted or modified. In no event will We consider working an average of more than the required Full-Time hours per week in itself to be a part of material duties. One of the material duties in Your Regular Occupation is the ability to work for an employer on a full-time basis."[25] In other words, since Jennifer was unable to perform *all* of her material duties *on a full time* basis she was disabled under the terms of the Plan.

The pre-litigation record documented the duties and skills Jennifer needed that formed the material duties of her regular occupation. She was required to have specific vision abilities including close vision, depth perception, and ability to adjust focus.[26] In addition to her retinal tear, the medical record documents that Jennifer experienced serious difficulties with her vision and fatigue while working at a computer and using the very skills that her job required.[27] One main duty required Jennifer to review, refine and publish corporate event packages to showcase

---

[24] Rec. 386
[25] Rec. 387
[26] Rec. 350-351
[27] Rec. 533

Utah Olympic Park and Utah Olympic Oval offerings.[28] Another main duty required Jennifer to "[e]nsure that all scheduling, contract, invoices and other administrative duties regarding events and corporate facility rentals is completed in accordance with UOP/UOV policies and procedures."[29] Jennifer had to negotiate contracts and coordinate and develop budgets with others within the organization. These tasks were computer dependent and overly taxing to Jennifer to the point that she couldn't do her job. United agreed with that assessment when it paid for her short term disability benefits, and no valid evaluation ever demonstrated that her disability had been resolved.

Other main duties required significant cognitive function that would have been dependent on her short term verbal memory. Jennifer had to actively recruit new groups for events through cold calling and contacting former clients.[30] Jennifer had to negotiate proposals with clients.[31] Jennifer had to demonstrate the ability to simultaneously manage multiple, complex issues with strong computer skills and proficiency with PC applications.[32] Jennifer was required to multi-task with strong attention to detail and ability to make decisions on the spot.[33] All of these were material duties of her regular occupation that Jennifer was unable to do. Furthermore, Jennifer cannot find any place in the record that United analyzes the material duties of her own occupation.

During her regular occupation period, Jennifer was not able to do these tasks on a full time basis. Even working a modified schedule, Jennifer was unable to perform the material

---

[28] Rec. 350
[29] Rec. 350
[30] Rec. 350
[31] Rec. 350
[32] Rec. 350
[33] Rec. 350

duties of her occupation without multiple breaks.[34] These identified responsibilities need to be

done at certain minimum skill levels and cannot simply be omitted or not performed

competently. This Court should conclude that Jennifer's responsibilities, including budgeting,

negotiation, client development and revision and implementation of corporate event packages

cannot be done when Jennifer is suffering constant fatigue, struggling with short-term memory,

attention and verbal issues, and having difficulty with flat light.[35] These were the symptoms that

United ignored when it denied Jennifer's claim for disability. Instead of disputing Jennifer's

symptoms and limitations, United relied on reviewers who insisted the cause of her symptoms

was simply a "whiplash injury without head trauma."[36]

### III. JENNIFER'S MEDICAL RECORDS DEMONSTRATE SHE HAD ONGOING SYMPTOMS THAT PREVENTED HER FROM DOING ALL THE MATERIAL DUTIES OF HER OWN OCCUPATION.

Multiple providers documented Jennifer's difficulties from the time of her accident

throughout the pre-litigation appeal process. In a Daily Note, dated December 15, 2015,[37] Lauren

Ziaks, DPT, ATC, Jennifer's physical therapist stated:

> [Jennifer] feels her eyes are improving since starting the therapy but she knows she still has deficits when she does the exercises or tries to work on the computer. She has been working long days and she was extremely fatigued following 2 [sic] 12 hour days.

In a Daily Note, dated June 1, 2016, Ms. Ziaks stated that Jennifer continued to have physical

pains from a surgery but that Jennifer was still very upset because of her ongoing headaches.[38]

At the end of June, Ms. Ziaks conducted a further concussion evaluation and found that Jennifer

---

[34] Rec. 533
[35] Rec. 79, 80, 83, 235,
[36] Rec. 463
[37] Rec. 77
[38] Rec. 118

suffered significant fatigue and headaches while using the computer at work and that her symptoms were negatively affecting her quality of life.[39] Ms. Ziaks identified functional limitations where Jennifer could only work in 45 increments before needing to take a break. In a Daily Note from August 4, 2016, Ms. Ziaks reported that Jennifer was "still exhausted all the time and thinks it is being on the computer at work but also notes that she still isn't back to her full work schedule." [40]

Justyn Manley, a Licensed Clinical Social Worker at Utah Center for Evidence Based Treatment also treated Jennifer to provide mental health support as Jennifer tried to return to work. Ms. Manley wrote on March 2, 2017, that Jennifer was tearful and overwhelmed even though she was only trying to work two days a week.[41] Adding to Jennifer's stress was her understanding that her new cognitive state was permanent and she was learning how to adjust to a new normal. In a treatment note dated April 28, 2017, Jennifer processed the news from her chiropractor that some of her cognitive state is permanent.[42] On May 5, 2017, Ms. Manley described how Jennifer was still showing symptoms of fatigue and a lack of concentration. Even social interactions required Jennifer to rest during the day to be able to avoid exhaustion.[43] An Auditory Processing Evaluation Summary, dated March 2, 2018, by Nancy Murray, AuD, CCC-A/SLP, Audiologist/Speech-Language Pathologist, identified hearing loss, listening fatigue, and auditory processing disorder as compounding problems that would have made it impossible for Jennifer to perform the material duties of her regular occupation. [44]

In a letter dated March 20, 2018,[45] Ms. Roalstad, PAC, wrote:

---

[39] Rec. 126
[40] Rec. 137
[41] Rec. 177
[42] Rec. 497, 521
[43] Rec. 497, 524
[44] Rec. 527-531.
[45] Rec. 533-535

[Jennifer] has been followed in our office since 11/2015 for concussive injury with whiplash sustained in a motor vehicle accident. Over two years later, while she has made gradual improvements, she continues to suffer from multiple prolonged issues and features consistent with post concussive syndrome complicated by whiplash mechanism of injury in addition to retinal tear in her R [sic] eye. These prolonged symptoms include; chronic neck pain, frequent headaches, visual function reduction with increased sensitivity, poor visual endurance, cognitive impairment with auditory processing, poor attentional control as well inability to multitask with lack of cognitive efficiency.

Ms. Roalstad confirmed that Jennifer's employment requires long periods of high executive functioning, multi-tasking in busy environments with prolonged cognitive and visual stimulation.[46] According to Ms. Roalstad, those conditions will generate physical and mental fatigue leading to cascading symptoms.[47] Even with all her efforts, Jennifer had not yet established the ability to rejuvenate and recover day to day for the intensity of demands in her regular occupation. Given those findings, Ms. Roalstad's recommendation that "Ms. Lowe is not able to resume her occupation at the same intensity and efficiency of employment as she has previous to the accident" was reasonable. Ms. Roalstad determined that Jennifer's physical, emotional and cognitive functional abilities limited her return.[48]

In her appeal, Jennifer provided United with an updated Physical Assessment of Restrictions for Purposes of Determining Disability from Ms. Roalstad.[49] Ms. Roalstad indicated that Jennifer is not capable of performing the material duties of her regular occupation, in part, because Jennifer would likely miss work between 5 to 10 days per month due to a need for recovery time, medical appointments, and symptom flare ups. This limitation alone is sufficient to find that Jennifer qualified for long-term disability benefits. In addition to not being able to work full-time as explained in the definition of material duties, the assessment identifies the

---

[46] Rec. 533
[47] Rec. 533
[48] Rec. 533-535
[49] Rec 537-539

cognitive focus and visual stimulation that cause mental fatigue at Jennifer's work.[50]

To make certain that United had the information it needed, Ms. Roalstad also completed a Cognitive Assessment of Restrictions for Purposes of Determining Disability.[51] Ms. Roalstad indicated that Jennifer has been referred to a cognitive behavior therapist and that Jennifer fatigues quickly which causes symptom exacerbation. Ms. Roalstad marked as poor all of the following:

- Abilities of concentration, persistence and pace
- Ability to adapt to stressful circumstances in work or work-like settings.
- Deal with the stress of ordinary work
- Persist at assigned tasks
- Ability to manage and control stress while dealing with clients and potential clients
- Ability to travel frequently
- Ability to maintain focus and concentration necessary to provide accurate and reliable advice to clients.

Ms. Roalstad's responses in the assessment show that Jennifer could not sustain the energy required for a fast paced, multi-faceted position like Group Sales Director. Her reports demonstrated that Jennifer could not perform the material duties of her regular occupation and as such, United should have approved her long term benefits.

No one examined Jennifer for her physical ailments in as comprehensive and thorough a way as Ms. Roalstad. Her diagnoses extend beyond the findings of Dr. Nichols' valid neuropsychological testing, but they confirm the findings of Jennifer's deficits in memory, attention and verbal areas. Ms. Roalstad's evaluations also put into perspective the flaws in Dr. Duff's invalid evaluation.[52] To the extent that United and its reviewers relied on Dr. Duff's report without fully considering Ms. Roalstad and other providers documented concerns, its

---

[50] Rec. 537
[51] Rec. 541-544
[52] The terms of the Plan specifically state that a Physician's Assistant" falls under the definition of "Physician" under the Plan.

decision is arbitrary and capricious.

It appears that United might have overlooked the letter to Social Security Disability Determination Services,[53] authored by Dr. Jason Smith that confirmed Jennifer's leave from her position as Director of Group Sales. Dr. Smith reached his conclusion after 25 office visits between March of 2017 and January of 2018. His in-person treatment and experience demonstrated that Jennifer achieved "some improvements in her neck pain and headaches, but only temporary improvements in her cognitive function and light and sound sensitivity."[54] Dr. Smith noted that Jennifer tried unsuccessfully to return to work but even a condensed schedule resulted in an increase in her pain and symptoms. She was unable to focus or multitask without getting frustrated and agitated. She was put on permanent leave from her position as Director of Group Sales as of May 2017. This was because she was having difficulty performing her required job duties. She couldn't tolerate looking at the computer screen, performing the multitasking required for her position without causing her symptoms to exacerbate.

Dr. Smith explained why his findings were objective.[55] "My findings were derived through physical examination, history, and reviewing diagnostic imaging of the head and cervical spine, video fluoroscopy of the cervical spine, vestibular nystagmography, computerized balance testing…, and neurological examinations, including evaluations of sensation, strength, balance and coordination, gait, neurocognitive functioning."[56] Dr. Smith determined that Jennifer suffered from chronic pain in her head, neck and eye, as well as showed neurological and cognitive signs of mild traumatic brain injury.[57]

---

[53] Rec. 546-548
[54] Rec. 546
[55] Rec. 547
[56] Rec. 547
[57] Rec. 547-548

Dr. Smith explained, "In my opinion, Jennifer is currently unable to resume employment due to the number or complaints and severity of her physical and mental impairments. My expectation is that Jennifer will see a moderately slow improvement in function over time as long as she doesn't overtax her brain."[58] Dr. Smith's objective, medical opinion was that Jennifer was disabled from her Regular occupation. Jennifer had problems with stamina and fatigue. Jennifer could not reasonably be expected to reliably perform an 8 hour work day, 40 hour work week while performing all of the material duties of her occupation. Jennifer's medical conditions would cause lapses in memory or concentration for several hours per day. Individually, any of Jennifer's conditions would, at best, make Jennifer a questionable employee. When all the factors are combined, it is evident that any employer in any occupation would find Jennifer to be an unacceptable employee.

IV.     **UNITED IGNORED THE MATERIAL DUTIES OF JENNIFER'S REGULAR OCCUPATION WHEN IT DENIED HER CLAIM FOR LONG TERM DISABILITY.**

The prelitigation documentation establishes that United failed to analyze the material duties of Jennifer's regular occupation. A typical analysis from United or the reviewers on which it relied focused exclusively on certain physical aspects of her job. Starting with its original denial for her short term disability claim, United's reviewer wrote, "Based on the medical records reviewed, there is no significant evidence of a functional or mental health impairment from 12-21-16 forward that would preclude [Jennifer] from performing her full time work activities. It would be reasonable to expect [Jennifer] to be able to walk or stand for 6 hours out of an 8 hour day with lifting no more than 20 pounds on an occasional basis and up to 10 pounds

---

[58] Rec. 548

on a frequent basis."[59] This was the decision that United reversed.[60] Although its letter contained no clues as to why it reversed its original determination to deny benefits, this assessment demonstrates that United failed to consider any of the cognitive duties of Jennifer's employment as well as the negative effects that her cognitive difficulties had on her ability to do her job.

United's failure to address the material duties of Jennifer's employment is even more readily discernible in its November 6, 2017, denial letter. The term "material duties" appears in the letter fewer than 10 times. The first time it appears is when United introduces the term on the first page of the letter.[61] It then appears two more times on the first page as part of the definition of disability. "Material Duties" appears four times on the second page as part of the continued definition of disability and the definition of material duties itself.[62] The last mention of the term "Material Duties" appears in the letter's conclusion. United declares, "there is a lack of sufficient evidence to support any neurological or cognitive impairment that would preclude you from performing the Material Duties of your Regular Occupation." But what United never did was identify or evaluate the Material Duties of Jennifer's occupation.

United's failure to even identify the main duties of Jennifer's regular occupation means that its decision to deny benefits was arbitrary and capricious. This failure was again evident with a review conducted by a Dr. Michael Chilungu.[63] Dr. Chilungu took the time to look beyond the paper record and on October 4, 2017 had a peer-to-peer consult with Jennifer's physician assistant, Ms. Roalstad.[64] Ms. Roalstad confirmed that Jennifer had difficulties

[59] Rec. 72
[60] 51
[61] Rec. 1199
[62] Rec. 1200
[63] Rec. 1261
[64] Rec. 1262

"engaging in labor that involved significant 'multitasking, processing, and integrating of new information.'" Ms. Roalstad also confirmed that her restrictions and limitations[65] were still in place. [66] Then, without addressing the material duties of Jennifer's occupation, Dr. Chilungu wrote that Jennifer could return to work if she were in an "environment that did not provide significant visual and cognitive challenges." The problem with this premise is the main duties of Jennifer's occupation required significant visual and cognitive challenges. Jennifer's main duties were listed in Jennifer's job description, and even though Dr. Chilungu wrote that he had the Job Description, he completely failed to refer to Jennifer's main duties in his review. Instead he focussed on basic physical elements, like standing, bending, kneeling, and sitting.[67]

United's choice to ignore competent medical opinions indicated the erroneous and arbitrary nature of its decision to deny Jennifer her long-term disability benefits. Dr. Lauren Drag, reviewed the medical records regarding Jennifer's claim. Dr. Drag noted that Jennifer had anxiety, PTSD, vision problems, fatigue and daily headaches. She also acknowledged the diagnoses of post concussion syndrome, cognitive impairment and the retinal tear.[68] While Dr. Drag initially expressed some concern regarding the validity of Jennifer's testing with Dr. Nichols she ultimately agreed that Jennifer's scores from that testing could be properly interpreted.[69] In her review Dr. Drag pointed out that the independent neuropsychological exam from Dr. Duff produced questionable validity and should not be used as a reliable indicator of Jennifer's current functioning. Nevertheless, United relied on Dr. Duff's invalid data instead of Dr. Nichols' valid data to determine that Jennifer was not entitled to disability benefits.

---

[65] Rec. 347-349
[66] Rec. 1262
[67] Rec. 1261
[68] Rec. 470
[69] Rec. 423-424.

Furthermore, Dr. Drag's report fails to address the material duties of Jennifer's occupation. She doesn't account for the cognitive difficulties while working on the computer or the fatigue that resulted from Jennifer's continued efforts at the job on a full time basis. Instead Dr. Drag discussed whether she believed whether Jennifer's conditions would affect her daily functioning.[70] But she said nothing about the material duties of Jennifer's occupation. By ignoring the diagnoses of Ms. Roalstad and minimizing the valid results of Dr. Nichols in favor of invalid testing by Dr. Duff, Dr. Drag's conclusions fail to provide[71] substantial evidence on which United could have relied to deny benefits.

Dr. Gordon's report is more problematic for United. While Dr. Gordon was of the opinion that Jennifer did not require the restrictions and limitations she had received, Dr. Gordon got to that conclusion by asking the wrong question. Dr. Gordon seemed more concerned with whether a cervical whiplash without head trauma could conceivably cause the symptoms that Jennifer reported and how those symptoms affected her daily living.[72] "As such, the issue is not whether [Jennifer's] capacity to complete activities of daily living is impaired, but rather, whether or not the neurocognitive and physiological symptoms she continues to experience (secondary to her 11/08/15 MVA) are impacting her ability to adequately perform complex workplace tasks." [73]

As Dr. Nichols suggests, when reviewers begin with the wrong question, they will ultimately reach the wrong result. There is simply insufficient evidence in the record to suggest

---

[70] Rec. 426
[71] *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003).
[72] Rec. 463
[73] Rec. 412

that anyone at United actually assessed Jennifer's symptoms and how it affected the material duties of her own occupation.

On the other hand, Dr. Nichols and Ms. Roalstad both discussed her symptoms in the context of work, and her ability to perform complex tasks that required memory, attention, and verbal capacity.[74] United gave short shrift to the medical records that supported Jennifer's disability and instead made every assumption that Dr. Duff's invalid results meant that Jennifer was more capable than what she said. Drawing conclusions from invalid data is a classic fallacy.

Jennifer's need for ongoing treatment began with the accident in November of 2015 and continued throughout 2016 and beyond. Her condition continued to decline despite treatment. Dr. Mendelssohn confirmed that "[i]t is fairly atypical for cognition to decline as time passes following a concussion injury. Nevertheless, it was noted that the claimant's symptoms were worsening and regression was present."[75] Later in Dr. Duff's evaluation, he criticized as inconsistent Jennifer's worsening scores on "mental flexibility, naming, semantic fluency, phonemic fluency, [and] nondominant manual dexterity."[76] While atypical, Jennifer's declines were consistent with her experience after injuries from the car accident. Dr. Duff's inability to evaluate the individual is exemplified in this interpretation which should have been a factor in demonstrating Jennifer's disabilities. Rather than explore in a meaningful and reasoned way the unique way Jennifer responded to treatment, United ignored the facts that it found inconvenient.

As a foundational principle, ERISA plan administrators, "may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." Tenth

---

[74] Rec. 533, 555-567, 411-413, 445-447
[75] Rec. 55
[76] Rec. 1347

Circuit precedent is to the same effect.[77] Even before *Nord* was decided, the Tenth Circuit held

that unrefuted evidence or testimony presented by a claimant in the pre-litigation claim and

appeal process may not be disregarded by an ERISA plan administrator.[78] The medical records in

this case present reliable evidence that prove Jennifer's entitlement to benefits, including the

opinions of Jennifer's treating physicians. At best, United unpersuasively challenged Dr.

Nichols' valid testing with Dr. Duff's invalid testing. As such United failed to present any good

reasons for ignoring or disputing the information in the medical records. United's failure to

respond to objective data and multiple limitation assessments in inexcusable and means that its

decision to deny benefits should be reversed as arbitrary and capricious. Consequently, Jennifer

provided the necessary medical records and proved her entitlement to the benefits she seeks in

this matter.

## V. UNITED'S FAILURE TO CONSIDER ALL RELEVANT FACTS AND EVIDENCE IN EVALUATING JENNIFER'S CLAIMS REQUIRES REVERSAL OF ITS DENIAL.

At least one of United's reviewers did conclude that Jennifer was disabled.[79] After United

initially denied Jennifer's short term benefits it retained Elana Mendelssohn Psy.D, to review the

decision as part of Jennifer's appeal. She had the records from Dr. Nichols, Ms. Roalstad, Ms.

Manley, and Dr. Smith. [80] Dr. Mendelssohn concluded that the restrictions and limitations were

supported.[81] Dr. Mendlessohn explained the atypicality of Jennifer's worsening recovery from

post concussive syndrome as results of Jennifer's increased anxiety, fatigue, and daily headaches

---

[77] *Rasenack v. AIG Life Ins Co*., 585 F.3d 1311, 1325-1326 (10th Cir. 2009); *Fought v. UNUM Life Ins. Co. of America*, 379 F.3d 997 (10th Cir. 2004) *cert. den.* 544 U.S. 1026 (2005).
[78] *Gaylor v. John Hancock Mut. Life Ins. Co*., 112 F.3d 460, 467-468 (10th Cir. 1997) ("Testimony as to a simple fact capable of contradiction, not incredible, and standing uncontradicted, un-impeached . . . must be taken as true. . . . Un-impeached credible evidence many not be disregarded by the trier of fact.")
[79] Rec. 53-58
[80] Rec. 53-56
[81] Rec. 55-57

and pain.[82] United relied on Dr. Mendelssohn's report in reversing its denial of Jennifer's benefits under the short term disability plan. Because there isn't a meaningful difference in the definitions between the short term and long term policies, other reviewers should have reached the same conclusions as Dr. Mendelssohn and Jennifer's treating providers.

This is how the Plan defined disability and disabled under the short term disability policy:

> Disability and Disabled means that because of an Injury or Sickness, a significant change in Your mental or physical functional capacity has occurred in which You are:
> (a) prevented from performing at least one of the Material Duties of Your Regular Job on a part-time or full-time basis; and
> (b) unable to generate Current Earnings which exceed 99% of Your Weekly Earnings due to that same Injury or Sickness.[83]

This is how the short-term policy defined material duties:

> Material Duties means the essential tasks, functions, and operations relating to Your Regular Job that cannot be reasonably omitted or modified. In no event will We consider working an average of more than 40 hours per week in itself to be a part of material duties. One of the material duties of Your Regular Job is the ability to work for an employer on a full-time basis.[84]

This is the definition of disability and disabled under the long-term disability policy:

> Disability and Disabled mean that because of an Injury or Sickness, a significant change in Your mental or physical functional capacity has occurred in which:
>
> a) during the Elimination Period, You are prevented from performing at least one of the Material Duties of Your Regular Occupation on a part-time or full-time basis; and
>
> b) after the Elimination Period, You are:
>
> 1. prevented from performing at least one of the Material Duties of Your Regular Occupation on a part-time or full-time basis; and
>
> 2. unable to generate Current Earnings which exceed 99% of Your Basic Monthly Earnings due to that same Injury or Sickness.

---

[82] Rec. 57
[83] Rec. 42
[84] Rec. 43

After a Monthly Benefit has been paid for 2 years, Disability and Disabled mean You are unable to perform all of the Material Duties of any Gainful Occupation.[85]

Here, the definition of Material Duties under the long-term disability policy:

> Material Duties means the essential tasks, functions, and operations relating to an occupation that cannot be reasonably omitted or modified. In no event will We consider working an average of more than the required Full-Time hours per week in itself to be a part of material duties. One of the material duties of Your Regular Occupation is the ability to work for an employer on a full-time basis. [86]

The medical records showed that Jennifer's symptoms actually worsened between the time she was evaluated for short term disability and when she appealed the denial of long term benefits. The letters provided by Ms. Roalstad and Dr. Smith explain her symptoms. In fact, Dr. Mendelssohn had explained any supposed inconsistency in her review from May 8, 2017.[87] To deny benefits, United had to ignore the opinion of its own reviewer and the unanimous opinions of Jennifer's treating providers.

Dr. Drag claimed that there were no objective or reliable data to confirm Jennifer's cognitive impairment.[88] When she made that claim, Dr. Drag completely ignored the objective findings of both Ms. Roalstad as well as the specific objective findings of Dr. Smith. She listed Dr. Smith's progress notes and letter to Social Security, so she had access to the letter. Dr. Smith made a point of identifying and explaining the objective bases for his conclusions. Dr. Drag ignored his objective findings.

---

[85] Rec. 386
[86] Rec. 387
[87] Rec. 57
[88] Rec. 480

Ms. Roalstad's progress notes showed that she used the SOAP approach in her practice. SOAP stands for Subjective, Objective, Assessment, and Plan.[89] Her objective measures included:

- fatigue, concentration, dizziness and light/noise sensitivity.[90]

- Lower than expected verbal memory and efficiency.[91]

- Decreased scores in verbal and visual memory, symptoms increased over previous reporting, Efficiency decreased.[92]

The arbitrary nature of United setting aside Dr. Smith's recommendations without explanation are exacerbated by Dr. Drag using invalid data from Dr. Duff to conclude that there was evidence of suboptimal effort on the neuropsychological.[93] Dr. Duff acknowledged that Jennifer's performance on "cognitive measures" was of questionable validity."[94] The consequence was that the test should not be used as a reliable indicator of current functioning.[95]But Dr. Drag appeared to reach conclusions of exaggeration and looking bad from invalid data rather than requesting a reexamination.[96] Because the treating providers provided uncontradicted evidence that Jennifer continued to be disabled after the short term disability, United's decision to deny benefits should be reversed. Dr. Nichols, Dr. Smith, and Ms. Roalstad all presented objective findings to support the disability.

---

[89] Rec. 793-822
[90] Rec. 814, 821
[91] Rec. 817
[92] Rec. 808
[93] Rec. 480
[94] Rec. 1343
[95] Rec. 1343
[96] Rec. 476

When a reviewer fails to consider all of the evidence before it, its decision is arbitrary and capricious.[97] Here, it appears that while the many reviewers listed the documents from multiple providers they failed to evaluate the opinions of Dr. Smith at all.[98] They also failed to evaluate the initial restrictions and limitations of Ms. Roalstad or her updated recommendations. Dr. Gordon simply said he disagreed.[99] But Dr. Gordon never explained why he disagreed or even specified with which recommendation he disagreed. Courts have recognized that decisions based on reviews that ignore relevant evidence are arbitrary and capricious.[100] This case is one where United's decision was arbitrary and capricious because it "simply ignored evidence that was inconvenient to its conclusion." [101]

In the *Foust* case, the court answered the question of whether there was "more than a scintilla of [other] evidence that a reasonable mind could accept as sufficient" to conclude the claimant was eligible to work under the terms of the Plan.[102] Because the decision to deny benefits ignored relevant medical records, United's evaluations did not amount to "a legitimate review of the medical records."[103] In a striking similarity, both Lincoln, the insurer in *Foust*, and United, in this case, claimed that there was insufficient objective data when it simply ignored the objective data found in the record. It is also noteworthy that both Mr. Foust and Jennifer were incapable of performing the material duties of their respective occupations because they had or would have struggles with memory and concentration at their work.[104] It is also noteworthy, that the record does not dispute Ms. Roalstad's claim that Jennifer would miss between 5-10 days

---

[97] *Rekstad v. U.S. Bancorp*, 451 F.3d 1114 (10th Cir. 2006)
[98] 458-464, 469-481
[99] Rec. 463
[100] *Foust v. Lincoln Nat'l Life Ins. Co.*, 2019 U.S. Dist. LEXIS 164576, at *21-22 (D. Utah 2019)
[101] *Foust v. Lincoln Nat'l Life Ins. Co.* at *22
[102] *Foust* at *24-25 citing *Eugene S. v. Horizon Blue Cross Blue Shield of New Jersey,* 663 F.3d 1124, 1133-34 (10th Cir. 2011)
[103] *Foust* at *25-26
[104] *Foust* at *26-27.

each month, a similar oversight in *Foust*.[105] However, unlike Mr. Foust's policy, the express definition of material duties includes Jennifer's ability to work full time during her regular occupation. This undisputed fact undermines the essence of United's claims. The undisputed and unrefuted objective facts of this case compel a reversal of United's decision to deny Jennifer benefits.

## VI.     JENNIFER IS ENTITLED TO AN AWARD OF PREJUDGMENT INTEREST AND ATTORNEY FEES AND COSTS.

In the event that the Court grants Jennifer's Motion for Summary Judgment, she requests an award of attorney fees and costs based on 29 U.S.C. §1132(g) and pursuant to *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242 (2010), as the prevailing party in this litigation. Jennifer requests the opportunity to present in future briefing additional information demonstrating why an award of prejudgment interest, attorney fees, and costs is appropriate.

## CONCLUSION

This Court should grant Jennifer's Motion for Summary Judgment and order United to pay her disability claim during the time of her regular occupation. The Court should further order that the question of coverage during her own occupation should be decided first by United, consistent with the terms of the Policy. While United had numerous reviewers take a look at Jennifer's case, almost all of them ignored the objective data that was contained in the medical records. United's failure results in two distinct outcomes in this case. First, the unrefuted facts establish that Jennifer qualified for benefits under the terms of the plan because she could neither work full time, nor could she perform all of the material duties of her regular occupation.

---

[105] Foust at *25

Second, United's decision to deny benefits was arbitrary and capricious because it failed to review all of the records that it was provided during the appeal.

Under these circumstances, this Court should conduct a *de novo* review and determine that Jennifer is eligible for benefits because she satisfied the terms of the Plan. Jennifer and her medical providers established that Jennifer could not do the material duties of her regular occupation. Her duties were cognitively complex, they required the use of memory and attention, as well as complicated multitasking. In addition, many of her material duties could only be accomplished on a computer, which exacerbated Jennifer's symptoms. While Jennifer asks this court to review her case *de novo*, she prevails under either standard of review.

Finally, this Court should order costs, attorney fees and prejudgment interest to Jennifer. Further, Jennifer reserves further briefing on that question after the Court issues its opinion.

DATED this 16th day of December, 2019.

s/ Brian S. King
Attorney for Plaintiff Jennifer Lowe

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been served on:

Scott M. Petersen
David N. Kelley
Nina K. Bertelli
FABIAN VANCOTT
215 South State Street, Suite 1200
Salt Lake City, UT 84151
spetersen@fabianvancott.com
dkelley@fabianvancott.com
nbertelli@fabianvancott.com

DATED this 16th day of December, 2019

s/ Brian S. King