**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH
CENTRAL DIVISION**

| | |
|---|---|
| JENNIFER L.,<br><br>                Plaintiff,<br><br>v.<br><br>UNITED OF OMAHA LIFE<br>INSURANCE COMPANY,<br><br>                Defendant. | **MEMORANDUM DECISION AND ORDER (1) GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DOC. NO. 24) AND (2) DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (DOC. NO. 25)**<br><br>Case No. 2:18-cv-00848-DAO<br><br>Magistrate Judge Daphne A. Oberg |

The parties, Plaintiff Jennifer L. ("Ms. L.")[1] and United of Omaha Life Insurance Company ("United"), filed cross motions for summary judgment on Ms. L.'s claim for recovery of long-term disability benefits under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq.* Having considered the parties' memoranda and the complete record in the matter,[2] the court GRANTS United's Motion for Summary Judgment ("Def.'s Mot.") (Doc. No. 24) and DENIES Ms. L.'s Motion for Summary Judgment and Memorandum in Support ("Pl.'s Mot.") (Doc. No. 25) for the reasons set forth below.

---

[1] Pursuant to best practices in the District of Utah addressing privacy concerns in certain cases, the court refers to the plaintiff by her first name and last initial only.

[2] The court concludes it does not need oral argument and will decide the motions on the basis of the written memoranda, as provided for in Rule 7-1(f) of the District of Utah's Local Civil Rules.

# I.    BACKGROUND[3]

## A.  The Plan

Ms. L. was a participant in an employee welfare benefit plan (the "Plan") as part of her employment as a Director of Group Sales with the Utah Olympic Legacy Foundation.  (R. 361, 557.)  The Plan provided eligible employees with both short-term disability ("STD") and long-term disability ("LTD") benefits through insurance policies issued by United.  (*Id.* at 11–49, 354–94.)  The Plan pays benefits to participants who become disabled under the terms of the LTD policy.  (*Id.* at 366.)  Under the Plan:

> Disability and Disabled mean that because of an Injury or Sickness, a significant change in [the participant's] mental or physical functional capacity has occurred in which:
> a)  during the Elimination Period, [the participant is] prevented from performing at least one of the Material Duties of [her] Regular Occupation on a part-time or full-time basis; and
> b)  after the Elimination Period, [the participant is]:
>   1.  prevented from performing at least one of the Material Duties of [her] Regular Occupation on a part-time or full-time basis; and
>   2.  unable to generate Current Earnings which exceed 99% of [her] Basic Monthly Earnings due to that same Injury or Sickness.

(*Id.* at 386.) [4]  The Plan defines "material duties" as the "essential tasks, functions, and operations related to an occupation that cannot be reasonably omitted or modified."  (*Id.* at 387.)

---

[3] While each party disputes the other's characterizations of the facts, the court pulls the factual background directly from the administrative record rather than the parties' characterizations. The administrative record of Ms. L.'s claim, containing documents numbered UNITED-0001 to UNITED-2209, was filed separately as Doc. No. 27.  All references to the administrative record are noted as R. 1 to R. 2209.

[4] The LTD policy contains two definitions of disability: an "Own Occupation Definition" of disability lasting for two years, after which the definition changes to an "Any Occupation Definition."  (R. 366, 386.)  United only considered Ms. L.'s eligibility for "own occupation" benefits.  (*See* Def. Mot. 40, Doc. No. 24; Pl.'s Opp'n to Def.'s Mot. for Summ. J. ("Pl.'s Opp'n") 4, Doc. No. 29.)

This includes "the ability to work for an employer on a full-time basis." (*Id.*) "Regular occupation" is defined as the occupation the participant is performing when her disability begins and also encompasses similar positions included in the United States Department of Labor's Dictionary of Occupational Titles. (*Id.* at 388.) The Plan evaluates a participant's "regular occupation" based on how the occupation is "normally performed in the national economy." (*Id.*)

**B.  Claim Background**

On November 8, 2015, Ms. L. was involved in a low-speed motor-vehicle accident. (R. 198.) According to Ms. L., she and the car behind her were both stopped at a red light. When the light changed to green, the car behind her started forward, rear-ending Ms. L.'s car. (*Id.*) Ms. L. did not hit her head and never lost consciousness. (*Id.* at 198, 1341.)

Shortly after the accident, Ms. L. began physical therapy with Lauren Ziaks and Dan Ivie, which she attended for more than a year. (*Id.* at 67–138.) During a concussion evaluation on November 13, 2015, Ms. L. reported fatigue, headaches, and difficulty with tasks requiring focus. (*Id.* at 67.) At a follow-up evaluation on March 1, 2016, Ms. L. reported consistent headaches affecting her ability to work, read, and complete activities of daily living. She reported feeling overwhelmed, dizzy, and anxious in public settings; however, she also reported feeling significantly better than when she started physical therapy in November of 2015. (*Id.* at 95–97.)

Ms. L. saw Melinda Roalstad, a certified physician assistant, on November 10, 2015. (*Id.* at 196–200.) Ms. Roalstad determined Ms. L. suffered from a concussion without loss of consciousness, whiplash injury of her cervical spine, deficiencies of smooth pursuit movements,

3

muscle spasms of her head and neck, and convergence insufficiency.  (*Id.* at 199.)  During a May 24, 2016 visit, Ms. L. reported she was attending physical therapy, hiking, and biking—and that "work [was] going good."  (*Id.* at 214.)  She reported an average energy level of ninety percent. (*Id.*)  Ms. Roalstad found Ms. L.'s "cognitive function [was] lower than expected."  (*Id.* at 215.)

As of June 2016, Ms. L. reported to Ms. Roalstad that her energy level was eighty percent of normal and reported pain and daily headaches.  She reported working eight to twelve-hour days.  (*Id.* at 218.)  Then, during a September 2016 visit, Ms. L. complained of worsening neck pain, average energy of fifty percent of normal, and chronic daily headaches.  (*Id.* at 221.)  She did not report taking any medication at either visit.  (*Id.* at 218, 221.)  By September, Ms. L. indicated she had vacationed for two weeks, obtained a puppy, and that she hiked and walked for exercise.  (*Id.* at 221.)  She reported continuing to work, but not "full days" and she had a "pretty flexible work schedule."  (*Id.*)  Two months later, in November 2016, Ms. L. reported energy levels between seventy and eighty percent while working around thirty hours per week.  (*Id.* at 224.)  She complained of anxiety, headaches, neck pain, and headaches triggered by "visually focused work" and fatigue.  (*Id.* at 224–25.)  Ms. Roalstad noted Ms. L.'s cognitive functioning was worse.  (*Id.* at 225.)

The medical notes also indicate Ms. L. had right shoulder surgery and a repair of a right retinal tear.  (*Id.* at 215, 534, 556.)

Ms. L. underwent a functional MRI ("fMRI") administered by Dr. Wendell Gibby on November 30, 2016.  (*Id.* at 235–38.)  The report indicated normal brain activation in most areas but noted some areas of abnormal activation "associated with short-term or verbal memory."  (*Id.* at 236.)

Ms. L. continued to work for approximately thirteen months after the accident, although sometimes with a reduced or modified schedule. (*Id.* at 221, 1338, 2178.) At various points during the year after her accident, Ms. L. reported skiing, hiking, biking, and golfing. (*Id.* at 103, 214, 221, 227.) During a December 2016 visit to Ms. Roalstad, Ms. L. reported having skied for a few hours that day, although she also reported daily headaches and an average energy level of eighty percent of normal. (*Id.* at 227.)

**C.  Short Term Disability and Additional Medical Records Considered**

Ms. L. submitted a claim for STD benefits on December 20, 2016 with a disability date of December 22, 2016 and an estimated return-to-work date of March 2017. (R. 344.) Ms. L.'s claim included an "attending-physician statement" by Ms. Roalstad, noting Ms. L.'s limitations related to visual focus and cognitive function. (*Id.* at 348–49.) Ms. Roalstad anticipated Ms. L. would be able to return to work in one to three months. (*Id.* at 349.)

After Ms. L. submitted the STD application, she saw Andrew Nichols, Ph.D., for a neuropsychological evaluation. (*Id.* at 241–53, 279–82.) Dr. Nichols diagnosed Ms. L. with adjustment disorder with mixed anxiety and depressed mood, and a mild neurocognitive disorder secondary to a traumatic brain injury. (*Id.* at 252, 281.) Overall, he noted that while there were no "areas of profound impairment," Ms. L.'s reductions in attention and executive functioning and her delayed recall were likely to have "a marked impact upon her ability to sustain her pre-TBI degree of workplace efficiency." (*Id.* at 251.) Dr. Nichols concluded, "Ms. L.'s attentional and auditory memory deficits [were] significant to the degree that she [would] benefit from modifying aspects of her workplace environment whenever possible," particularly with respect to meetings and information processing. (*Id.* at 252.)

After filing for STD benefits, Ms. L. also began attending psychotherapy with Justyn Manley, LCSW.  (*Id.* at 167–73.)  Ms. Manley diagnosed Ms. L. with adjustment disorder with mixed anxiety and depressed mood.  (*Id.* at 172.)  Ms. L. attended counseling sessions with Ms. Manley between February and June 2017.  (*Id.* at 1202.)

On February 13, 2017, United denied Ms. L.'s initial application for STD benefits.  (*Id.* at 190–94.)  In its decision, United recounted its review of Ms. L.'s medical records as well as her continued work and recreational activities.  (*Id.*)  United ultimately concluded "there were no identifiable cognitive or functional restrictions and limitations that precluded [Ms. L.] from performing [her] job."  (*Id.* at 192.)

In March 2017, Ms. L. began seeing Jason Smith, a chiropractor, for neck pain and headaches. (*Id.* at 546.)  She saw him approximately twenty-five times between March 2017 and January 2018.  (*Id.*)  During the course of treatment, Dr. Smith saw "some improvements in [Ms. L.'s] neck pain and headaches, but only temporary improvements in her cognitive function and light and sound sensitivity."  (*Id.*)

Ms. L. appealed the denial of STD benefits in April 2017.  (*See id.* at 188.)  To better evaluate Ms. L.'s appeal, United obtained a peer review of Ms. L.'s condition from an outside expert, Dr. Elana Mendelssohn, a neuropsychologist.  (*Id.* at 53–58.)  Upon reviewing the records submitted on appeal, Dr. Mendelssohn found support for "mild neurocognitive disorder, secondary to traumatic brain injury and adjustment disorder with mixed anxiety and depressed mood."  (*Id.* at 56.)  She found the results of Dr. Nichols' comprehensive neuropsychological evaluation valid, including findings that Ms. L.'s "performance on tasks of sustained attention, memory and verbal fluency were below expectation" and her "executive functioning was

6

variable." (*Id*.)  Dr. Mendelssohn opined Ms. L.'s diagnoses impacted her daily functioning in

terms of "compromised attention, memory, and aspects of executive functioning." (*Id*.)  She

concluded the underlying records supported "the presence of a functional impairment from

12/22/16 through 3/22/17." (*Id*.)  However, Dr. Mendelssohn also observed that Ms. L.'s

"worsening cognition is not consistent with the typical recovery from post concussive

syndrome." (*Id.* at 57.)

　　　After reviewing this documentation, in a letter dated May 9, 2017, United informed Ms.

L. it had overturned its original denial of STD benefits and would pay the maximum amount of

benefits through March 22, 2017. (*Id.* at 51; *see also id.* at 1201.)

### D.  Long-Term Disability

　　　Once Ms. L.'s STD benefits expired, United reviewed her claim for LTD benefits,

continuing to pay Ms. L. benefits under a "reservation of rights" while it completed its analysis.

(R. 1199, 1309–10.)  In consideration of Ms. L.'s long-term disability claim, United requested

independent evaluations of Ms. L.'s medical records and her cognitive, psychiatric, and

functional abilities. (*See id.* at 1337–48, 1261–63.)

　　　　1.　Independent Neuropsychological Evaluation by Kevin Duff, M.D.

　　　First, an independent neuropsychological evaluation was conducted in August 2017 by

Dr. Kevin Duff, a board-certified neuropsychologist and professor in the Department of

Neurology at the University of Utah School of Medicine. (R. 1337–48.)  Dr. Duff based his

evaluation on a "review of medical records, interview, and test results," including records from

Ms. Roalstad, Dr. Smith, Dr. Mendelssohn, and Dr. Nichols, among others. (*Id.* at 1337, 1339–

41.)

In his report, Dr. Duff noted that "[b]esides work, [Ms. L.] endorsed few clear difficulties with day-to-day activities." (*Id.* at 1337.) She denied difficulties driving, handling money, or completing household chores. (*Id.* at 1338.) She engaged in regular physical exercise, including hiking and golf, and she had "recently tried paddle boarding." (*Id.*) Ms. L. reported "cognitive problems, psychiatric symptoms, and ongoing pain" as the reasons she could not work. (*Id.*)

Dr. Duff conducted a variety of tests to evaluate Ms. L. He observed that behaviorally, Ms. L. "seemed to be putting forth adequate effort," but cognitively, some measures of effort showed her performance was equivocal and some suggested "poor effort." (*Id.* at 1342.) Dr. Duff ultimately concluded Ms. L.'s "performance on cognitive measures [was] of questionable validity," her "psychiatric symptoms appear[ed] exaggerated" and, as such, test results did not reliably indicate her functioning. (*Id.* at 1343.) Dr. Duff noted he would not expect to see worsening cognitive test scores since "traumatic brain injuries are not expected to show significant decline, especially over short periods of time." (*Id.* at 1347.) Given this, and given the errors Dr. Duff found in Dr. Nichols' evaluation, he concluded Ms. L.'s "self-reported difficulties at work may not be fully accurate." (*Id.* at 1345; *see also id.* at 1346.) "At the very least, [Dr. Duff] did not obtain valid and reliable evidence to support [Ms. L.'s] report of her difficulties with any daily activities." (*Id.* at 1345.)

In short, Dr. Duff found many inconsistencies. He found inconsistencies between Ms. L.'s presentation and ability to complete neuropsychological testing in six hours, and her performance on the same tests. (*Id.* at 1347.) He found inconsistencies between Ms. L.'s "self-

reported post-concussive symptoms" and the "severity of her accident."[5]  (*Id.*)  And he found inconsistencies between "the severity of cognitive, psychiatric, and somatic symptoms" Ms. L. reported and the few difficulties she had completing "day-to-day activities."  (*Id.*)

2.  Independent Review by Michael Chilungu, M.D.

On October 4, 2017, Michael Chilungu, a neurologist, completed an independent review of Ms. L.'s claim file.  (R. 1261.)  He reviewed Ms. L.'s job description, Ms. Roalstad's attending physician statement, and Dr. Duff's neuropsychological evaluation; however, he did not consider the evaluations of Dr. Nichols or Dr. Mendelssohn.  (*Id.*)  Dr. Chilungu spoke directly with Ms. Roalstad; Ms. Roalstad had most recently treated Ms. L. three months before. (*Id.* at 1262.)  Dr. Chilungu recounted Ms. Roalstad's belief that Ms. L. "could 'return to work in some capacity,' with appropriate occupational restrictions put into place."  (*Id.*)  Ms. Roalstad reported Ms. L. "was not suffering from physical neurologic impairments per se," and that she had normal neurological functioning apart from her self-reported complaints of cognitive problems, dizziness, headache, and neck pain.  (*Id.*)

Based on the information Dr. Chilungu reviewed, he concluded "clinical evidence d[id] not support neurologic functional impairment that would result in limitations or restrictions." (*Id.*)  He also concluded Ms. L. could "likely work immediately, although it would be reasonable for her to select a line of work that minimizes stress, and is not reputed to be fast paced or cognitively taxing."  (*Id.* at 1264.)  He characterized this suggested limitation as only a "practical guideline, as opposed to a hard restriction" based on evidence of impairment.  (*Id.*)

---

[5] Dr. Duff noted that Ms. L. "appeared to be exaggerating her level [of] post-concussive symptoms," in that she reported symptoms "higher than 94% of patients with acute and severe TBIs."  (R. 1343.)

3.   <u>Medical Review by Jonathan McAllister II, M.D.</u>

In October 2017, Dr. Jonathan McAllister, a physician board-certified in internal medicine, and a Vice President and Medical Director at United, also reviewed Ms. L.'s medical records and claim file.  (R. 1225–29.)  Dr. McAllister concluded that "the available information does not reflect the need for work restrictions or limitations from December [] 2016 forward." (*Id.* at 1227.)  Regarding Ms. L.'s cognitive complaints, Dr. McAllister noted that while formal neuropsychological testing indicated some cognitive deficits, Ms. L. appeared not to give the testing full effort.  (*Id.* at 1227–29.)  Dr. McAllister concluded Ms. L. had not suffered a significant head injury that would be expected to result in traumatic brain injury, and there were no structural abnormalities shown in her MRI.  (*Id.*)  While the fMRI noted abnormalities, Dr. McAllister pointed out this testing is of limited significance and is "not utilized in the current standard practice of medicine."  (*Id.*)  Dr. McAllister found Ms. L.'s capacity to manage her day-to-day affairs inconsistent with "significant cognitive abnormalities."  (*Id.*)  Finally, he observed he would not expect Ms. L. to be able to return to work for a significant period of time and then, later, find herself "unable to work due to cognitive deficits from a traumatic brain injury."  (*Id.*)

Analyzing Ms. L.'s complaints of headaches, Dr. McAllister noted that records from December 2016 forward did not reflect "ongoing or consistent treatment with a neurologist, pain management specialist, or other headache specialist."  (*Id.* at 1227.)  The records did not show medical management or emergency or urgent care visits for headaches.  (*Id.* at 1227–28.) Finally, the records did not show "abnormalities on MRI of the brain" or abnormalities in neurologic examinations.  (*Id.* at 1228.)

Regarding Ms. L.'s complaints of neck and shoulder pain, Dr. McAllister noted Ms. L.'s neck MRI showed no "significant abnormalities." (*Id*. at 1228.) He found Ms. L.'s "tendinosis of two rotator cuff tendons," without more, to be of "limited significance." (*Id*.) Overall, Dr. McAllister concluded Ms. L.'s records lacked what he would expect to see for severe neck or shoulder pain such as: (1) the type of ongoing treatment he would expect; (2) the markers he would expect to see in physical exams, such as decreased range of motion; (3) medication management; (4) interventions; or (5) the frequency or intensity of treatment he would expect, given the reported pain levels. (*Id*.) Likewise, with respect to the level of Ms. L.'s reported dizziness, Dr. McAllister found Ms. L.'s records did not show the level of treatment, testing, medication management, or falls or accidents he would expect. (*Id*.) Dr. McAllister concluded Ms. L.'s ability to drive, bike, ski, and ambulate without assistance were inconsistent "with a patient with severe dizziness." (*Id*.)

For similar reasons, Dr. McAllister discounted Ms. L.'s reports of depression and anxiety. (*Id*. at 1228.) He noted that her recent records did not "reflect ongoing treatment or evaluation with psychology or psychiatry." (*Id*.) Ms. L. had been prescribed no medication for anxiety or depression, she had no record of suicidal ideation or thoughts, and no hospital visits for psychiatric issues. (*Id*.) Dr. McAllister found the frequency and intensity of counseling sessions Ms. L. attended "were inconsistent with debilitating depression and/or anxiety." (*Id*.)

Based on his evaluation of Ms. L.'s complaints, Dr. McAllister concluded that "the available medical records reflect the insured's ability to perform full time work as of [December 2016] without restrictions or limitations." (*Id.* at 1229.)

### 4.  United's LTD Decision (November 6, 2017)

In a letter dated November 6, 2017, United informed Ms. L. of its denial of her LTD claim.  (R. 1199–06.)  The letter outlined the documentation United reviewed and recounted Ms. L.'s accident, symptoms, and treatment.  (*Id.* at 1200–02.)  United summarized Dr. Duff's independent evaluation and his conclusions that the neurological testing results were of questionable validity.  (*Id.* at 1202–03.)  United recounted Dr. Chilungu's conclusions based on his call with Ms. Roalstad.  (*Id.* at 1203.)  United also considered Dr. McAllister's review and his conclusion that "there are no supported work restrictions or limitations."  (*Id.*)[6]  Ultimately, United found "a lack of sufficient evidence to support any neurological or cognitive impairment that would preclude [Ms. L.] from performing the Material Duties of [her] Regular Occupation."[7]  (*Id.* at 1204.)

### 5.  Ms. L.'s Appeal of United's Initial LTD Denial and United's Final Denial

Ms. L. appealed United's denial of benefits, making three arguments.  (R. 492–505.)  First, she claimed she had continually met the definition of disability since December 22, 2016.  Second, she claimed United ignored "substantial evidence . . . indicating cognitive and memory deficits that would prevent her from successfully working in her Regular occupation."  (*Id.* at 495.)  Third, she claimed United ignored ample evidence of "relative decline in cognitive function."  (*Id.*)

---

[6] The LTD denial letter does not explicitly mention Dr. McAllister by name but does reference the date of his evaluation.  (*See* R. 1203; *see also* R. 1225–29.)

[7] Although the LTD denial letter does not explicitly mention the evaluation of Dr. Mendelssohn, United was clearly aware of this evaluation and accounted for it, as evidenced by the fact that it overturned its denial of STD benefits after receiving her evaluation.  (R. 51.)

12

To support her first argument, Ms. L. included an updated assessment from Ms. Roalstad, indicating Ms. L. was "not able to resume her occupation at the same intensity and efficiency of employment as she had previous to the accident. . . . [H]er physical, emotional and cognitive functional abilities are limiting her return to the same level." (*Id.* at 498.)  Ms. L. also submitted a letter from her chiropractor, Dr. Smith, in which he suggested Ms. L. was unable to return to work due to her physical and mental impairments, but that he anticipated improvement over time.  (*Id.* at 499.)  Ms. L.'s appeal also summarized a March 2018 evaluation from an audiologist, Nancy Murray, AuD, CCC-A/SLP, indicating Ms. L. suffered from mild hearing loss, hyperacusis, listening fatigue, and an auditory processing disorder.  (*Id.* at 497–98.)

In support of her second argument, regarding substantial evidence, Ms. L. resubmitted Dr. Gibby's report of her fMRI evaluation.  (*Id.* at 500.)  Ms. L. also resubmitted Dr. Nichols' neuropsychological evaluation, claiming the evaluations provided substantial evidence that she was unable to work in her regular occupation.  (*Id.*)  In support of her third argument, Ms. L. summarized and included numerous letters from family and friends confirming the changes that had occurred in her life to corroborate her inability to work.  (*See id.* at 501–05.)

After receiving Ms. L.'s appeal, United requested a medical and psychological peer review.  (*Id.* at 483–86.)

### a.  Review by Lauren Drag, PhD, ABPP-CN

Dr. Lauren Drag, who specializes in neuropsychology, performed a file review on May 23, 2018.  (R. 469.)  Dr. Drag found the records she reviewed—including the records Ms. L.

submitted on appeal, evaluations from treating providers, and letters from friends and family[8]—
supported a diagnosis of post-concussional syndrome and adjustment disorder with mixed
anxiety and depressed mood.  (*Id.* at 469–77.)  However, Dr. Drag found insufficient evidence to
indicate Ms. L.'s cognitive or psychiatric symptoms were "of sufficient severity to impact her
daily functioning."  (*Id.* at 478.)  She considered the letters submitted by Ms. L.'s family and
friends but found them unsupported by Ms. L.'s "two previous neuropsychological evaluations."
(*Id.*)  With respect to Dr. Nichols' evaluation, Dr. Drag noted Ms. L. "performed within normal
limits across the majority of tasks with average performance on multiple measures that are
sensitive to the cognitive effects typically associated with traumatic brain injury (e.g., working
memory, processing speed, attentional shifting)."  (*Id.* at 478.)  She did not find support for Dr.
Nichols' diagnosis of mild neurocognitive disorder.  (*Id.* at 477.)  Evaluating other cognitive
screenings, Dr. Drag concluded "there is no objective evidence from any of the multiple formal
cognitive tests that supports a significant cognitive deficit."  (*Id.* at 478.)

With respect to psychiatric symptoms, Dr. Drag noted Ms. L.'s therapist indicated "her
depression and anxiety [had] improved to a point where termination of therapy was being
discussed in June of 2017."  (*Id.*)  As of November 2017, Ms. L.'s self-reported scale of

---

[8] The parties dispute whether Dr. Drag considered Ms. Roalstad's and Dr. Smith's findings.
(Def.'s Reply 4, Doc. No. 32.)  Dr. Drag's notes indicate she reviewed Ms. Roalstad's records
through March 20, 2018.  (R. 470.)  The Assessment of Restrictions completed by Ms. Roalstad
was undated, but Ms. L. contends it was completed with an accompanying narrative portion of
the same form and an Assessment of Limitations, both dated March 20, 2018.  (Pl.'s Reply 4–5,
Doc. No. 33.)  Based on Ms. L.'s representations regarding the date of completion of these
documents and their submission to United upon appeal, it appears these documents were
considered by Dr. Drag.  (R. 469.)  Dr. Drag also reviewed Dr. Smith's notes, including a letter
he submitted on Ms. L.'s behalf to the Social Security Administration which was included in her
LTD appeal.  (*Id.* at 473; *see also id.* at 545–48.)

depression and anxiety suggested mild to no symptoms.  (*Id.*)  Dr. Drag considered the

limitations suggested by Ms. L.'s attending physicians but concluded they lacked "clear

objective support." [9]  (*Id.* at 479.)  She also raised concerns about "suboptimal effort" in Ms. L.'s

neurological evaluations and "symptom magnification" in personality testing.  (*Id.* at 480.)  She

noted that persistent and worsening symptoms "following a mild, uncomplicated traumatic brain

injury" are inconsistent with the "expected recovery trajectory."  (*Id.* at 479.)  Finally, Dr. Drag

observed that Ms. L. had not obtained the treatment for pain she would have expected based on

her reported symptoms.  (*Id.*)  After full review, Dr. Drag concluded "there [was] not sufficient

objective evidence that the claimant's cognitive and psychiatric symptoms [were] of sufficient

severity to impact the claimant's daily functioning."  (*Id.*)  Consequently, Dr. Drag found no

evidence to support any restrictions or limitations.  (*Id.*)

### b.   *Medical Review by Wayne Gordon, M.D.*

Dr. Wayne Gordon, a board-certified neurologist, conducted an external review of Ms.

L.'s case in May 2018.  (R. 458.)  In addition to comprehensively summarizing Ms. L.'s medical

records, Dr. Gordon spoke with Ms. Roalstad and attempted to speak with Dr. Smith.  (*Id.* at

458–62.)  Dr. Gordon found the only supported diagnoses were "of cervical strain and cervical

whiplash injury."  (*Id.* at 463.)  He concluded the restrictions and work limitations suggested by

Ms. Roalstad were unsupported, (*id.*), but deferred "any comments about psychological

treatments or psychotherapy to the appropriate specialty," (*id.* at 464).

---

[9] In the referral forms for the evaluations conducted by Dr. Gordon and Dr. Drag, Ms. L.'s
attending physicians are identified as Dr. Nichols, Ms. Manley, Dr. Smith, and Ms. Roalstad.  (R.
483, 485.)

United sent Ms. L. a letter dated June 4, 2018, along with copies of the physician

consultants' reports, noting that "[t]he medical documentation did not provide medical evidence

to support physical or cognitive restrictions and limitations that would preclude Ms. L[.] from

performing her occupation." (*Id.* at 452.)

>    6. Ms. L.'s Rebuttals and United's Responses

In response, Ms. L. submitted a rebuttal from Dr. Nichols, the neurologist who conducted

an evaluation of Ms. L. in March 2017. (R. 445.) In his June 2018 rebuttal letter, Dr. Nichols

raised concerns that Dr. Drag and Dr. Gordon had minimized the fMRI findings of Dr. Wendell

Gibby. (*Id.*) He noted Dr. Gibby's findings were consistent with his findings of "pronounced

impairments in regards to Ms. L[.]'s ability to sustain attention and reduce cognitive fatigue in

regards to verbally-mediated information." (*Id.* at 446.) Dr. Nichols also disagreed that the

neurological exam he conducted had questionable validity. (*Id.*) He argued the diagnosis of

mild neurocognitive disorder, secondary to TBI, was supported by testing. (*Id.* at 446–47.)

United asked Dr. Gordon and Dr. Drag to provide responses to Dr. Nichols' rebuttal. (*Id.*

at 438, 442.) After review of Dr. Nichols' rebuttal, Dr. Gordon stood by his conclusion that "a

neurologic impairment with restrictions and limitations ha[d] not been documented from a

cervical whiplash injury from this low speed rear end collision." (*Id.* at 435.) He noted that

fMRI testing "is experimental and that there is no baseline for comparison." (*Id.*) After her

review of the rebuttal report, Dr. Drag submitted an addendum to her own report. (*Id.* at 423–

27.) She agreed with Dr. Nichols that the first neuropsychological evaluation did not show

"compelling evidence of suboptimal effort and [did] not preclude interpretation of the scores."

(*Id.* at 424.)  Further, Dr. Drag agreed with Dr. Nichols that there were "areas of cognitive

abnormality evident in his evaluation."  (*Id.* at 426.)  However, she found:

> [G]iven the claimant's normal performance across multiple other memory and
> attention measures and across all other cognitive domains, I do not find these
> abnormalities to be of sufficient severity or consistency to indicate a diagnosis of
> Mild Neurocognitive Disorder or to significantly impact daily functioning on a
> more likely than not basis.

(*Id.*)  In sum, Dr. Drag still found the records, considered as a whole, did not support a finding

that Ms. L. had a functional impairment.

Ms. L. submitted a second rebuttal letter as well as an additional letter from Dr. Nichols,

dated July 20, 2018.  (*Id.* at 408–13.)  Dr. Nichols argued that, in testing, an examiner should

compare performance to pre-morbid functioning in order to accurately gauge limitations.  (*Id.* at

411.)  He maintained that his diagnosis of mild neurocognitive disorder was proper, and that Ms.

L.'s "continued neurocognitive and physiological symptoms make her susceptible to

experiencing profound frustration, distress, and inefficiency within real-world workplace

settings."  (*Id.* at 413.)

### 7.   United's Final LTD Benefits Decision on Appeal

On August 2, 2018, United sent Ms. L.'s attorney a letter indicating it was upholding the

denial of Ms. L.'s claim.  (R. 395–401.)  In reaching this conclusion, United relied on Ms. L.'s

job description, the underlying medical records, the reports of multiple independent medical

examiners/reviewers, neurological tests, treatment notes, the information submitted in Ms. L.'s

rebuttal, and letters from her family and friends.  (R. 396–97.)  In short, United concluded "the

[medical] documentation does not provide clinical or diagnostic findings to support physical or

cognitive deficits in [Ms. L.'s] functional abilities that would have precluded her from

performing her occupation." (*Id.* at 399.)  Consequently, United affirmed its denial of benefits. (*Id.*)

## II.    STANDARD OF REVIEW

Under Rule 56 of the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In ERISA cases, where both parties move for summary judgment, thereby stipulating no trial is necessary, "summary judgment is merely a vehicle for deciding the case; the factual determination of eligibility for benefits is decided solely on the administrative record, and the non-moving party is not entitled to the usual inferences in its favor."  *LaAsmar v. Phelps Dodge Corp. Life*, 605 F.3d 789, 796 (10th Cir. 2010) (internal quotations omitted).

A challenge under 29 U.S.C. § 1132(a)(1)(B) to a plan administrator's decision to deny benefits is "reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."  *LaAsmar*, 605 F.3d at 796 (internal quotations omitted).  Where a plan does give the administrator discretionary authority, the court's review is deferential—the court asks "only whether the denial of benefits was arbitrary and capricious."  *Id.* (internal quotations omitted).

Here, the parties dispute whether the Plan gives United the requisite discretionary authority.  (*See* Def.'s Mot. 25, Doc. No. 24; Pl.'s Mot. 18–21, Doc. No. 25.)  The disputed section of the Plan, entitled "Authority to Interpret Policy," states:

> By purchasing the Policy, the Policyholder grants Us the discretion and the final authority to construe and interpret the Policy.  This means that We have the authority to decide all questions of eligibility and all questions regarding the amount and payment of any Policy benefits within the terms of the Policy as

interpreted by Us.  Benefits under the Policy will be paid only if We decide in Our discretion that a person is entitled to them.  In making any decision, We may rely on the accuracy and completeness of any information furnished by the Policyholder, You or any other third party.

The Policyholder further grants Us the authority to delegate to third parties, including, without limitation, United of Omaha Life Insurance Company and any third party administrator with whom We have contracted to provide claims administration and other administrative services, the discretionary authority granted in the Policy.  The Policyholder expressly grants such third party the full discretionary authority granted to Us under this Policy.

You and Your beneficiary has the right to request a review of Our decision.  If, after exercising the Policy's review procedures, You or Your beneficiary's claim for benefits is denied or ignored, in whole or in part, You or Your beneficiary may file suit and then a court will review Your or Your beneficiary's eligibility or entitlement to benefits under the Policy.

(R. 382.)

Ms. L. argues the language providing United with discretionary authority "appears to limit that authority to the prelitigation process."  (Pl.'s Mot. 18, Doc. No. 25.)  Ms. L. focuses her argument on the third paragraph, suggesting that the language—a "court will review Your . . . entitlement to benefits"—implies *de novo* review.  (*Id.* at 18–19.)  Alternatively, Ms. L. argues the language is ambiguous and, consequently, should be interpreted against United, as the drafter of the disputed language.  (*Id.* at 19–20.)

The court finds the plain language of the "Authority to Interpret Policy" provision to be clear and unambiguous.  The first two paragraphs grant United authority to "construe" and "interpret" the Plan, resolve questions regarding eligibility, and exercise discretion in determining eligibility and benefits.  The third paragraph of this section neither negates this grant of discretionary authority nor requires the court to apply a *de novo* standard of review.  It merely advises the insured of the right to judicial review.  Because the Plan language gives the

administrator discretionary authority to interpret the Plan's terms and make benefits determinations, the court reviews United's decision denying benefits for abuse of that discretion. *See Nance v. SunLife Assurance Co. of Can.*, 294 F.3d 1263, 1268 (10th Cir. 2002) ("[W]hen . . . a plan states that the grant or denial of a particular benefit is to be determined by proof satisfactory *to the administrator*, courts have said that deferential review is proper." (emphasis added)).

"In the ERISA context, [the court] treat[s] the abuse of discretion and the arbitrary and capricious standards of review as interchangeable." *Loughray v. Hartford Grp. Life Ins. Co.*, 366 F. App'x 913, 923 (10th Cir. 2010) (unpublished).  Reviewing courts ask only whether the plan administrator's "decision was reasonable and made in good faith." *Eugene S. v. Horizon Blue Cross Blue Shield of N.J.*, 663 F.3d 1124, 1133 (10th Cir. 2011) (internal quotations omitted). The court will uphold the decision "'so long as it is predicated on a reasonable basis,' and 'there is no requirement that the basis relied upon be the only logical one or even the superlative one.'" *Id.* at 1134 (quoting *Adamson v. Unum Life Ins. Co. of Am.*, 455 F.3d 1209, 1212 (10th Cir. 2006)).  "Indicia of arbitrary and capricious decisions include lack of substantial evidence, mistake of law, bad faith, and conflict of interest by the fiduciary." *Caldwell v. Life Ins. Co. of N. Am.*, 287 F.3d 1276, 1282 (10th Cir. 2002).  Substantial evidence is "more than a scintilla but less than a preponderance." *Rekstad v. U.S. Bancorp*, 451 F.3d 1114, 1120 (10th Cir. 2006) (internal quotations omitted).  It is evidence "a reasonable mind could accept as sufficient to support a conclusion." *Eugene S.*, 663 F.3d at 1134.  In determining whether the evidence is substantial, the court accounts for what detracts from its weight, considering the record as a whole. *Rekstad*, 451 F.3d at 1120.

Even under an arbitrary and capricious standard, the court must account for the fact that ERISA imposes "a special standard of care upon a plan administrator." *Metro Life Ins. Co. v. Glenn*, 554 U.S. 105, 115 (2008).  As a fiduciary, the plan administrator must "'discharge [its] duties' in respect to discretionary claims processing 'solely in the interests of the participants and beneficiaries' of the plan." *Id.* (quoting 29 U.S.C. § 1104(a)(1)).  Among other things, this requires plan administrators to conduct a "full and fair review" of claim denials.  29 U.S.C. § 1133(1).

When an entity plays a dual role as a plan administrator and insurer with an economic interest in the outcome of the claim, the resulting conflict of interest should "'be weighed as a factor in determining whether there is an abuse of discretion.'" *Metro Life. Ins. Co.*, 554 U.S. at 114–15 (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)).  The conflict should carry more weight "where circumstances suggest a higher likelihood that it affected the benefits decision." *Id.* at 117.  It should carry "less weight where the administrator has minimized the risk that the conflict would impact the benefits decision." *Loughray*, 366 F. App'x at 923.  As just one example, in *Loughray*, where a plan administrator contracted with an independent medical examiner to evaluate a claimant's entitlement to benefits, the Tenth Circuit found the conflict warranted "little weight." *Id.* at 924–25.  The court evaluates United's dual role as plan administrator and insurer below.

## III.   DISCUSSION

United argues its LTD decision was reasonable and supported by substantial evidence, including Ms. L.'s continued work, daily activities, and underlying medical records.  (Def.'s Mot. 1, 28, Doc. No. 24.)  United points out its initial decision was supported by the opinions of

three doctors, Dr. Duff, Dr. Chilungu, and Dr. McAllister, all of whom concluded Ms. L. did not

have any functional limitations and was not disabled under the terms of the Plan.  The opinions

of two additional doctors, Dr. Drag and Dr. Gordon, supported the denial of Ms. L.'s appeal.

United contends both the Plan and the law allow it to use its discretion to "choose among

competing opinions" about the evidence, particularly under an arbitrary and capricious standard

of review.  (*Id.* at 40.)

     Ms. L., on the other hand, argues United's decision fails under an arbitrary and capricious

standard because "United failed to consider all of the relevant medical information in the

appeal."  (Pl.'s Mot. 16–17, Doc. No. 25.)  Specifically, Ms. L. contends that United ignored her

"constant fatigue, struggl[e] with short-term memory, attention and verbal issues, and . . .

difficulty with flat light" and that these symptoms, along with others, prevented her from

performing certain "material duties of [her] regular occupation."  (*Id.* at 23, 28–33.)

Additionally, Ms. L. argues United improperly ignored records from her treating providers

documenting her symptoms and that United failed to consider the material duties of her regular

occupation.

### A.  Dual Role Conflict of Interest and Impact on Standard of Review

     As an initial matter, the court considers whether to give United's decision less deference

because United serves as both plan administrator and insurer.  Importantly, much of the

underlying support for United's decision came from the independent medical reviews and

evaluations of doctors Duff, Chilungu, Drag, and Gordon.  (*See* R. 395–01.)  Independent

medical evaluations are indicia of a complete investigation and can inculcate a plan administrator

from claims that a conflict of interest impedes impartiality.  *See Holcomb v. Unum Life Ins. Co.*

*of Am.*, 578 F.3d 1187, 1193 (10th Cir. 2009).  For example, in *Nelson v. Aetna Life Insurance Company*, the Tenth Circuit gave Aetna's dual-role conflict of interest "limited weight" because it had reduced possible bias by hiring five independent medical specialists to review the claimant's file.  568 F. App'x 615, 620 (10th Cir. 2014) (unpublished).  Like the defendant in *Nelson*, United obtained numerous independent medical evaluations.  Moreover, Ms. L. presents no evidence, beyond the bare denial of her claim, that United's dual-role conflict had an impact on its determination.  Consequently, the court gives United's dual-role conflict of interest little to no weight and reviews its decision for abuse of discretion.

Having determined the standard of review, the court looks at the two predominant and interrelated issues presented by the parties: Ms. L.'s contention that United ignored information it was required to consider in denying benefits, and United's contention that substantial evidence supports its decision.  (*See* Pl.'s Mot. 28–38, Doc. No. 25; Def.'s Mot. 26–40, Doc. No. 24).

**B.  Whether United Ignored Evidence**

Ms. L.'s argument is two-fold.  First, she argues United ignored material evidence submitted by her family, friends, and treating providers.  (Pl.'s Opp'n to Def.'s Mot. for Summ. J. ("Pl.'s Opp'n") 19–21, Doc. No. 29; Pl.'s Reply to Def.'s Opp'n to Pl.'s Mot. for Summ. J. ("Pl.'s Reply") 10–12, Doc. No. 33).  Second, Ms. L. argues United's analysis and denial were incorrect because they ignored the material duties of her regular occupation.  (Pl.'s Mot. 28–33, Doc. No. 25.)

1.  <ins>United's Approach to Evidence</ins>

An insurer's decision is arbitrary if it ignores evidence or views it in a one-sided manner. *See Rekstad*, 451 F.3d at 1121.  "Plan administrators . . . may not arbitrarily refuse to credit a

23

claimant's reliable evidence, including the opinions of a treating physician." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003).  The requirement to fairly consider reliable evidence arises from ERISA's implementing regulations, which provide that the review of an appeal of an adverse benefits decision should consider "all comments, documents, records, and other information submitted by the claimant relating to the claim."  29 C.F.R. § 2560.503-1(h)(2)(iv).

Ms. L. submitted letters from family and friends describing her inability to work and her impairments since the accident.  (Pl.'s Opp'n 32–34, Doc. No. 29.)  Her former co-workers, family, and friends described a marked change in her activity level.  (*See, e.g.*, R. 576–92.)  While United admits it did not "refer to these letters directly," it contends the "failure to mention them is not evidence of a failure to consider them."  (Reply Mem. in Support of Def.'s Mot. for Summ. J., ("Def.'s Reply") 19, Doc. No. 32.)  In support of this position, United cites *Joel S. v. Cigna*, in which the court declined to find a decision arbitrary and capricious because the defendant did not mention treating physician letters in its decision.  356 F. Supp. 3d 1305, 1319–20 (D. Utah 2018).  The court in *Joel S.* did not disrupt the decision, despite this omission, because the denial of benefits was supported by substantial evidence.  *See id.* at 1319 ("It is true that Cigna did not refer to these letters directly, but a failure to mention them does not per se indicate a failure to consider them.").

The court finds United adequately considered the submissions of Ms. L.'s family and friends.  In its final denial letter, United recognized Ms. L. "submitted letters from family and friends supporting" her complaints; however, United found the complaints were not "supported by the neuropsychological evaluations."  (R. 398.)  United's decision echoes the finding of Dr.

24

Drag, who conducted a peer review of the claim file on appeal and explicitly discussed the letters from Ms. L.'s family and friends. (*Id.* at 475, 478.) United appears to have given Ms. L.'s letters from family and friends more consideration than the defendant in *Joel S.* gave physician letters. Moreover, as discussed below, United's decision to deny Ms. L.'s claim is supported by substantial evidence, considering the whole record.

United also fairly considered the opinions submitted by Ms. L.'s treating providers, namely: Ms. Roalstad, Ms. Ziaks, Dr. Smith, Dr. Nichols, and Dr. Gibby. Ms. L. argues United improperly ignored the record and the opinions of her treating providers because they contained subjective reports of symptoms as opposed to objective testing. (Pl.'s Opp'n 21, Doc. No. 29.) In support of this argument, Ms. L. relies on *Laurie v. United of Omaha Life Insurance Company*, No. 3:14-cv-01937-YY, 2017 U.S. Dist. LEXIS 35430 (D. Or. Jan. 23, 2017) (unpublished). In *Laurie*, the claimant's primary issue was fatigue and her diagnosis of Chronic Fatigue Syndrome was based entirely on subjective symptoms. *Id.* at *2–8, 47–49. All the defendant's medical consultants found the claimant was "not magnifying or exaggerating her symptoms." *Id.* at *48–49. Because the plaintiff's plan did not exclude conditions supported only by subjective complaints, the court found the denial of benefits constituted an abuse of discretion. *Id.* at *57. In contrast to *Laurie*, Ms. L.'s symptoms were addressed and accounted for by independent evaluators. United found Ms. L.'s reported symptoms inconsistent with her underlying medical records as well as her activities of daily living. (R. 397.) For these reasons, the analysis in *Laurie* is unhelpful.

The record shows United adequately considered the opinions of Ms. L.'s treating physicians but found them to be either contradicted or discounted by independent medical

examiners.  For example, United adequately considered Ms. Roalstad's treatment and opinions in its evaluation of Ms. L.'s LTD claim.  Multiple medical providers, including Ms. L.'s own treating physicians, discussed Ms. L.'s case with Ms. Roalstad, reviewed her notes, and incorporated an analysis of her treatment and conclusions into their opinions.[10]  United relied on the whole of this information in denying Ms. L.'s claim.  (*See id.* at 396–97.)  It cannot fairly be said that United ignored Ms. Roalstad's opinion; it just disagreed with it.  The same can be said for the opinions of Ms. L.'s chiropractor, Dr. Smith,[11] her physical therapist, Ms. Ziaks,[12] and her consulting doctor, Dr. Gibby.[13]  (*Id.* at 1201–02, 396–99.)  The opinions of numerous medical experts as to the validity of these treating physicians' conclusions, coupled with United's own review of the records, shows United fully considered these records and opinions and reasonably decided they were not determinative.

Ms. L. complains specifically about United's approach to Dr. Nichols.  For instance, Ms. L. argues United ignored Dr. Nichols' second rebuttal; specifically, his discussion of Ms. L.'s

---

[10] In addition to United's direct consideration of Ms. Roalstad's records and conclusions, the following medical professionals considered them in their respective reviews: Dr. Gibby (R. 235); Dr. Gordon (*id.* at 428–33); Dr. Drag (*id.* at 469–71); Dr. McAllister (*id.* at 1225–27); Dr. Chilungu (*id.* at 1261–64); Dr. Duff (*id.* at 1340); and Dr. Nichols (*id.* at 1455).

[11] In addition to United's direct consideration of Dr. Smith's records and conclusions, the following medical professionals considered them in their respective reviews: Dr. Gordon (*id.* at 461, 463); Dr. Drag (*id.* at 469, 473); Dr. McAllister (*id.* at 1225); and Dr. Duff (*id.* at 1339).

[12] In addition to United's direct consideration of Ms. Ziaks' records and conclusions, Dr. Duff considered them in his evaluation.  (*See id.* at 1339, 1346.)

[13] In addition to United's direct consideration of Dr. Gibby's records and conclusions, the following medical professionals considered them in their respective reviews: Dr. Gordon (R. 435, 463); Dr. Nichols (*id.* at 411, 413, 445–46); Dr. Drag (*id.* at 469, 473); Dr. McAllister (*id.* at 1225); and Dr. Duff (*id.* at 1340).

"reductions in 'auditory and attention/working memory.'"  (Pl.'s Reply 11, Doc. No. 33 (citing

R. 445).)  Ms. L. also argues United failed to consider Dr. Nichols' suggestion that other

etiological factors besides a head injury could have contributed to her symptoms.  However, in

its denial of Ms. L.'s appeal, United explained that while it considered Dr. Nichols' second letter,

the letter did not change its evaluation because no new medical evidence was submitted.  (R. at

399.)  There is no question that United extensively considered the neurological evaluation by Dr.

Nichols that formed the basis for the issues raised in Dr. Nichols' rebuttal letters.[14]  (*See id.* at

398–99.)  Indeed, United took Dr. Nichols' opinions so seriously that it asked Dr. Gordon and

Dr. Drag to respond to his initial rebuttal.  (*See id.* at 423–27, 435–36.)  Dr. Nichols' opinion was

considered in depth by Dr. Drag, a board-certified clinical neuropsychologist, who concluded the

abnormalities Dr. Nichols found were not sufficiently severe as to indicate a neurocognitive

disorder or to significantly impact Ms. L.'s daily functioning.  (*Id.* at 469, 471–72, 476–79, 480–

81.)  United relied on this finding in its decision.  (*Id.* at 396, 398–99.)  Dr. Nichols' initial

testing and interpretations were assiduously analyzed by Dr. Duff as well.  (*See id.* at 1346.)

Given this consideration, the court finds United fully and fairly considered Dr. Nichols'

evaluation and opinions.

While United cannot "arbitrarily refuse to credit a claimant's reliable evidence," plan

administrators do not have a "discrete burden of explanation when they credit reliable evidence

that conflicts with a treating physician's evaluation."  *Black & Decker Disability Plan*, 538 U.S.

---

[14] In addition to United's direct consideration of Dr. Nichols' records and conclusions, the following medical professionals considered them in their respective reviews: Dr. Gordon (*id.* at 428–30, 435); Dr. Drag (*id.* at 423–27, 469, 471–72, 476–77, 480–81); Dr. McAllister (*id.* at 1225); and Dr. Duff (*id.* at 1340).

at 834.  In other words, United has no obligation to give special weight to treating physicians and providers over independent medical evaluators.  *See Chalker v. Raytheon Co.*, 291 F. App'x 138, 143–44 (10th Cir. 2008) (unpublished) (finding it was not arbitrary and capricious to credit reports of two independent reviewers who reviewed the treating physician reports, rather than the claimant's treating providers themselves).  Legitimately, United considered but disagreed with the opinions of Ms. L.'s treating providers, relying instead on the reviews of several independent examiners.

### 2.  Material Duties of Ms. L.'s Occupation

Next, Ms. L. argues United's decision was arbitrary and capricious because the reviewers on which it relied, and United's own evaluation, ignored the material duties of Ms. L.'s occupation.  (Pl.'s Mot. 28–31, Doc. No. 25; Pl's Opp'n 19, Doc. No 29.)  In denying Ms. L.'s claim, United has the obligation to address the "specific plan provisions on which [its] determination is based."  29 C.F.R. § 2560.503-1(g)(1)(ii).  United complied with this obligation. It specifically addressed the policy provision upon which it relied to deny Ms. L.'s claim.  (*See* R. 395, 1199–1200.)  In relevant part, the Plan provides that "Disability or Disabled means that *because of an Injury or Sickness, a significant change in [the claimant's] mental or physical functional capacity* has occurred."  (*Id.* at 386 (emphasis added).)  The change must then result in the claimant's inability to perform at least one material duty of her occupation.  (*Id.*)

The independent medical reviewers upon whom United relied in part—Dr. Duff, Dr. Chilungu, Dr. Drag, and Dr. Gordon[15]—were asked to evaluate limitations to Ms. L.'s functional

---

[15] United also claims it relied on the independent medical examination of Dr. Cohan.  (Def.'s Mem. in Opp'n to Pl.'s Mot for Summ. J. 34–35, Doc. No. 28.)  Ms. L. says United did not

capacity.  In response, Dr. Chilungu concluded that "clinical evidence does not support a neurologic functional impairment that would result in limitations or restrictions."  (*Id.* at 1262.) Dr. Gordon[16] concluded that "[a] neurologic impairment with restrictions and limitations has not been documented from the cervical whiplash injury from this low speed rear end collision."  (*Id.* at 463.)  Because Dr. Duff concluded Ms. L.'s test results were invalid due to her questionable effort, he could not obtain evidence supporting Ms. L.'s limitations.  (*Id.* at 1347.)  Dr. Drag found no "valid and reliable evidence to support restrictions and/or limitations" from the records she reviewed.  (*Id.* at 479.)  And she found no impact of Ms. L.'s confirmed "diagnoses on daily functioning."  (*Id.* at 478.)  These responses informed United's determination as to whether a significant change in Ms. L.'s mental or physical functioning occurred due to injury or illness.

Likewise, United itself considered Ms. L.'s job description in its determination.  (*See id.* at 396.)  Where multiple independent medical examiners concluded Ms. L. did not have *any* functional limitations, United needed to go no further.  (*See id.* at 1204 ("[T]here is a lack of sufficient evidence to support *any* neurological or cognitive impairment that would preclude you from performing the Material Duties of your Regular Occupation[.]" (emphasis added)); *see also*

---

consider Dr. Cohan's review in denying Ms. L.'s LTD claim.  (Pl.'s Reply 13, Doc. No. 33.) Ms. L. is correct that United did not consider Dr. Cohan's review in its LTD decisions.  (R. 396–97, 1200–01.)  Given that the evidence supporting United's decision satisfies the substantial evidence standard, United's failure to consider Dr. Cohan's report—particularly, his conclusion that the medical record did not support a physical impairment in function that would result in restrictions or limitations from December 22, 2016 to March 22, 2017—does not change the outcome here.  (*Id.* at 2183.)

[16] Dr. Gordon's report included a summary of Ms. L.'s job duties, including "generating and coordinating special events," "work[ing] with Public [R]elations and [the] Program Manager," and ensuring that "events are held to the highest standards and the guest experience is excellent." (R. 459.)

*id.* at 399 ("[W]e find the [medical] documentation does not provide clinical or diagnostic findings to support physical or cognitive deficits in your client's functional abilities that would have precluded her from performing her occupation.").)  United did not improperly ignore the language of the Plan in evaluating whether Ms. L. met the definition of disabled.  It simply found it unnecessary to proceed to consider the material duties of Ms. L.'s occupation where United found Ms. L. suffered no impairment.

### C.  Whether Substantial Evidence Supported United's Decision

The court next considers whether substantial evidence supports United's denial of Ms. L.'s LTD benefits claim.  In reviewing the record to determine if "substantial evidence . . . support[s] the administrator's decision, it is not [the court's] role to weigh or evaluate the medical evidence in the record."  *Williams v. Metro Life Ins. Co.*, 459 F. App'x 719, 726 n.4 (10th Cir. 2012) (unpublished).  The "job of weighing valid, conflicting professional medical opinions is not the job of the courts; that job has been given to the administrators of ERISA plans."  *Corry v. Liberty Life. Assur. Co.*, 499 F.3d 389, 401 (5th Cir. 2007); *see also Chen v. CenturyLink*, No. 15-cv-01651-MSK-KMT, 2017 U.S. Dist. LEXIS 76511, at *23–24 (D. Colo. May 18, 2017) (unpublished) ("Although the Court might not necessarily have weighed the evidence in the same way as the Plan Administrator, it is not for the Court to substitute its assessment of the evidence for that of" the plan administrator.).

United's denial of Ms. L.'s long-term disability benefits is supported by substantial evidence.  In its denial, consistent with the conclusions of its independent evaluators, United focused on inconsistencies between Ms. L.'s self-reported symptoms and the nature of her

accident and subsequent daily activities.[17]  United found no objective evidence to support Ms.

L.'s reports of headaches, neck and shoulder pain, or dizziness, and found Ms. L.'s course of

treatment (or lack thereof) inconsistent with her subjective symptoms.  (R. 1203–04.)  Similarly,

United cited the fact Ms. L. sought no course of treatment consistent with "debilitating

depression and anxiety."  (*Id.* at 1204.)  Although United took note of Ms. Roalstad's conclusion

that Ms. L. "could likely return to work with[] some restrictions and limitations," it expressed

skepticism about Ms. L.'s symptoms in light of the fact that traumatic brain injury entails gradual

improvement, not deterioration.  (*Id.* at 1203.)  United cited Dr. McAllister's[18] extensive review

of the medical records and his conclusion that "the available medical documentation" does not

support "work restrictions or limitations."  (*Id.*)  Although United acknowledged the existence of

"neuropsychological testing noting some cognitive deficits," referring to Dr. Nichols' evaluation,

it concluded this cannot be considered "as a measure of [Ms. L.'s] functional capacity" in light of

recent testing indicating a lack of effort.[19]  (*Id.* at 1203.)

---

[17] Among other things, United found Ms. L.'s ability to drive, manage her own finances, manage her medications, and take care of her daily affairs "inconsistent with reported significant cognitive abnormalities."  (R. 1203.)  United also indicted that "[i]t would not be expected that [she] would be able to work for a significant period of time and then be unable to work due to cognitive deficits from a traumatic brain injury."  (*Id.*)

[18] United does not mention Dr. McAllister by name, but does point to his October 11, 2017 review of "all of the relevant medical documentation."  (R. 1203.)  United also references Dr. Chilungu's October 4, 2017 call with Ms. Roalstad, without referring to Dr. Chilungu by name.  (*Id.*)  As Ms. L. points out, Dr. Chilungu did not consider all the medical records.  (Pl.'s Reply 15–16, Doc. No. 33; *see also* R. 1261.)  Had United only relied on Dr. Chilungu's analysis to deny Ms. L.'s benefits claim, this might pose a problem.  However, Dr. Chilungu's evaluation was one of many United relied upon.

[19] Ms. L. takes issue with Dr. McAllister's evaluation because it purportedly takes Dr. Duff's "supposition" that the test results were invalid and turns it into a "fact."  (Pl.'s Reply 12–13,

On appeal, United relied on the opinions of independent evaluators as well as a comprehensive review of the underlying medical records, to conclude Ms. L.'s physical or cognitive deficits would not preclude her from performing her own occupation.  (*Id.* at 395–401.) United highlighted Dr. Drag's observation that Ms. L. "performed in the average range on multiple measures that are sensitive to cognitive deficits usually associated with traumatic brain injuries" in Ms. L.'s evaluation by Dr. Nichols.  (*Id.* at 398; *see also id.* at 478.)  United pointed out that Dr. Nichols' later submissions did not change Dr. Gordon's conclusion that the restrictions suggested by Ms. L.'s treating providers were unsupported by the medical records. (*Id.* at 398; *see also id.* at 435, 463.)  United also relied on Dr. Drag's observations that any abnormalities found in Dr. Nichols' testing were not of "sufficient severity or consistency" to "significantly impact daily functioning," and that "there is no objective evidence from any of the multiple formal cognitive tests that support a significant cognitive deficit."  (*Id.* at 398; *see also id.* at 426, 478.)  Again, United found Ms. L.'s reported physical and cognitive complaints inconsistent with her activities, such as hiking, biking, skiing, snow shoveling, driving, and other activities of daily living.  (*Id.* at 397.)

As this outline of the evidence relied upon makes clear, United's findings are supported by substantial evidence.  The findings are supported by multiple independent reviewers' conclusions that the results of Ms. L.'s testing and records do not support a mental or physical

---

Doc. No. 33.)  However, where Dr. Duff's concerns about Ms. L.'s testing effort were based on "formal measures of cognitive effort," his conclusions cannot be characterized as supposition. (*See* R. 1342, 1346.)  Ms. L. also claims Dr. McAllister ignored Ms. L.'s abnormal fMRI.  (Pl.'s Reply 13, Doc. No. 33.)  This is not true.  Dr. McAllister considered the fMRI but gave it little weight.  (*See* R. 1227 (noting fMRI testing is "not utilized in the current standard practice of medicine" and is of limited significance).)

impairment; her daily functioning and recreational activities that are inconsistent with her self-reported symptoms; her return to work, in some capacity, for more than a year after the accident; the nature of her treatment given her self-reported symptoms; and the typical expectation that brain injuries gradually improve over time. The possibility of a different, but logical, decision based on the evidence is not enough to overturn United's conclusion here. *Adamson*, 455 F.3d at 1212 ("[T]here is no requirement that the basis relied upon be the only logical one or even the superlative one.").

Ms. L.'s criticisms of the reviewing physician's reports are not enough to show United acted arbitrarily and capriciously.[20] In *Matthews v. Hartford Life & Accident Insurance Company*, for example, the court acknowledged disagreement between the treating physician and reviewing physicians' opinions. No. 1:14-cv-94-TS, 2015 U.S. Dist. LEXIS 76623, at *9–10, 16–17 (D. Utah June 12, 2015) (unpublished). Observing that the reviewing physician reports were "thorough, detailed, and reasoned," *id.* at *16, the court found the disagreement between physicians immaterial given the substantial evidence standard, *id.* at *18. Similarly, here, the medical reviewers who looked at Ms. L.'s claim considered the records and opinions of her treating providers in a detailed, careful, well-reasoned manner. There is no requirement that

---

[20] Ms. L. argues her case is like that of *Foust v. Lincoln National Life Insurance Company*, 416 F. Supp. 3d 1319 (D. Utah 2019). (Pl.'s Mot. 37, Doc. No. 25.) There, the district court concluded the defendant's denial of long-term disability benefits lacked support under the substantial evidence standard. *Foust*, 416 F. Supp 3d at 1330. It found error in the defendant's failure to explain why unrebutted findings were "incorrect or would not prevent [the plaintiff] from working." *Id.* at 1332. This case is different because the evidence Ms. L. presented was considered and rebutted by independent medical examiners. Ms. L.'s other cited case, *Meiri v. Hartford Life & Accident Insurance Company*, is unhelpful because it was analyzed under a *de novo* standard of review. No. 16-cv-00103-JST, 2017 U.S. Dist. LEXIS 115224, at *34 (N.D. Cal. July 24, 2017) (unpublished).

United's decision be the only logical conclusion from the evidence presented; ERISA only requires the decision to "reside[] somewhere on a continuum of reasonableness—even if on the low end." *Adamson*, 455 F.3d at 1212 (internal quotations omitted).  United's decision more than meets this burden.

### D.  Whether United's Denial of Long-Term Benefits After Approving Short-Term Benefits was Arbitrary and Capricious

Ms. L. argues United's decision to grant STD benefits and then deny LTD benefits "while looking at essentially the same evidence" is arbitrary and capricious.  (Pl.'s Reply 1–2, Doc. No. 33.)  Ms. L.'s argument fails on its face.  United had no obligation to approve long-term disability benefits just because it approved short-term disability benefits.  To evaluate the LTD benefits decision, United obtained significant additional information—notably, medical evaluations by Dr. Gordon, Dr. Drag, Dr. McAllister, Dr. Chilungu, and Dr. Duff—all of whom either questioned Ms. L.'s claimed limitations or assessed her functioning as inconsistent with a finding of disability.  (R. 458–64, 469–81, 1225–1229, 1261–64, 1337–48.)  The court finds no abuse of discretion in United's decision to deny LTD benefits after paying STD benefits.

## IV.    CONCLUSION

For these reasons, the court GRANTS United's Motion for Summary Judgment (Doc. No. 24), DENIES Ms. L.'s Motion for Summary Judgment (Doc. No. 25), and enters summary judgment in favor of United and against Ms. L. on her claim.

DATED this 23rd of September, 2020.

BY THE COURT:

_Daphne A. Oberg_

Daphne A. Oberg
United States Magistrate Judge